IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
vs.                            )    Case No.
                               )    3:15-cr-182
JERRY CHRISTOPHER BOSTICK,     )
                               )
            Defendant.         )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE TODD J. CAMPBELL, DISTRICT JUDGE

TRANSCRIPT

OF

PROCEEDINGS

March 18, 2016

Motion to Suppress Hearing

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
APPEARANCES:

        For the Government: Mr. Joseph P. Montminy
                            Mr. Phil Wehby
                            Asst. U.S. Attorneys
                            110 Ninth Avenue S., Suite A961
                            Nashville, TN 37203

        For the Defendant:  Mr. Edward M. Yarbrough
                            Mr. J. Alex Little
                            Attorneys at Law
                            511 Union Street, Suite 1600
                            Nashville, TN 37219

PREPARED BY:

                CATHY B. LEIGH, RDR, CRR
                Official Court Reporter
                801 Broadway, Room A839
                 Nashville, TN 37203
                  (615) 512-7544

1                          I N D E X

2

3                                                        Page

4                         GOVERNMENT'S PROOF

5   DUSTIN MILLER:
        Direct Examination by Mr. Montminy          16
6       Cross-Examination by Mr. Yarbrough          45
        Redirect                                    57
7       Recross                                     60

8   AMBER TREAT:
        Direct                                      62
9       Cross.                                      88
        Redirect                                    106
10      Recross                                     111
        Redirect                                    114
11

12

    EXHIBITS
13
        G1   CD of phone files                      30
14      G4A  Transcript of calls Miller to dispatch 30
        G4B  Transcript of calls to Brevard County  40
15      G4C  Transcript of calls Treat to dispatch  77
        G3   Search warrant                         86
16      D1   NCIC report                            96
        D2   Certified court document Brevard County 111

17

18

19

20

21

22

23

24

25

1       The above-styled cause came on to be heard on

2   March 18, 2016, before the Honorable Todd J. Campbell,

3   District Judge, when the following proceedings were had,

4   to-wit:

5       THE COURT: Welcome, and good morning. We're here

6   in the case of *United States versus Jerry Bostick*. And

7   what's been filed is a motion to suppress and a request for a

8   *Franks* hearing.

9       Yesterday I issued an order advising the parties

10  about former student of mine who apparently was involved in

11  this matter. And I wanted to have the parties comment on

12  that, and then we'll see where it goes.

13      Mr. Montminy.

14      MR. MONTMINY: Yes, sir. Good morning, Your

15  Honor.

16      THE COURT: Good morning.

17      MR. MONTMINY: It is the government's position,

18  Your Honor, that the government does not have an objection to

19  Your Honor remaining on this case. The government does have

20  an understanding that you did teach Captain O'Neil several

21  years ago in one class. It is the government's position that

22  based on that that the government believes you could be fair

23  and impartial. The government does not intend to calling

24  Captain David O'Neil as a witness during the course of this

25  hearing. As of right now, he is unlikely would be a witness

1  at trial at this juncture.

2          The government believes that based on the

3  relationship based on the teacher-student relationship not

4  being such an intimate relationship that the government

5  believes that you can be fair and impartial during the course

6  of this case.

7          THE COURT:  Well, let me set out what I know so

8  that the parties know it.  I have taught at multiple

9  institutions.  One is the Nashville School of Law.  There I

10  have taught a class amazingly called Federal Courts, but it

11  is not typical federal courts class.  It is more in the line

12  of a sampler of federal causes of action.  I have taught it

13  off and on for many years.  I don't know exactly how long.

14          I do remember a student who sat in the front row

15  and identified himself as a Brentwood police officer, which

16  is pertinent to the course since it deals with Section 1983

17  particularly excessive force.  And one of the things that I

18  do to show the dynamic of excessive force actions and how

19  they unfold is I play a modest amount of video about police

20  encounters with citizens.  And within the last year, that's

21  essentially been all over the news.  It is easy to get now.

22  Back then, it was a little harder to get when I had this

23  student in my class.

24          The student gave me a video of training regarding

25  police excessive force, and I use that video from time to

1   time in the class that I subsequently teach.  I have never

2   visited with the student.  He's never been to my home.  I

3   have never been in his home.  I have no personal

4   relationship.

5          But regarding all of the students I deal with,

6   there are various degrees of encounters with them, and this

7   one was a -- he was in my class, and that's what I know.  So

8   that's everything I know.

9          MR. MONTMINY:  Yes, Your Honor.

10         THE COURT:  And apparently he has taken the bar

11   and passed and at least is identified as an attorney in these

12   papers, but I don't even know that.

13         MR. MONTMINY:  Just for the record, Your Honor,

14   the government has confirmed that Captain David O'Neil as put

15   in the government's response is in fact the individual that

16   you are speaking of.  And he does state that he was your

17   student.  I also advised defense counsel that Captain David

18   O'Neil is unavailable for court between now and Wednesday if

19   defense counsel had further followup questions.  As a

20   courtesy, I just relayed that to them.

21         THE COURT:  Okay.  Well, so the government has no

22   objection to me proceeding?

23         MR. MONTMINY:  That is correct, Your Honor.

24         THE COURT:  All right.

25         Mr. Yarbrough.

1          MR. YARBROUGH:  Yes, Your Honor.

2          May it please the Court, after receiving the

3   Court's notice yesterday, I met with Mr. Bostick and went

4   over in detail with him what the issue might be with regard

5   to that.  And actually assuming that that was the same

6   individual and now that's been confirmed by the government,

7   neither Mr. Bostick or his counsel have any objection

8   whatsoever to Your Honor proceeding with this hearing today.

9          THE COURT:  Okay.  I would have recused myself

10  outright if I felt that it was a matter that required that.

11         MR. YARBROUGH:  Right.

12         THE COURT:  But from an ethical point of view, I

13  just think you need to know what I know and make your

14  decision.

15         MR. YARBROUGH:  We appreciate that, but we have no

16  problems at all proceeding as we are currently assigned.

17         THE COURT:  All right.

18         Then I have reviewed the motion to suppress that's

19  been filed and the opposition, and at this point it would

20  appear that we should hear the motion to suppress.  And then

21  what I will likely do is issue a written opinion as to

22  whether the motion to suppress has merit or lack of merit and

23  whether *Franks* hearing is warranted or not warranted

24  depending on how this unfolds.

25         But Mr. Montminy, what do you have in mind?

1          MR. MONTMINY:  Yes, sir.

2          THE COURT:  How we got into this posture is I

3   believe we had a status conference.  There was a defense

4   indication probably be a motion to suppress.  And in the

5   order resetting the trial date, we set this hearing.

6          MR. MONTMINY:  Yes, Your Honor.  So just that I am

7   clear, Your Honor, you would like the government to comment

8   on the preliminary threshold showing to pursuing a *Franks*

9   hearing?

10         THE COURT:  Yes.

11         MR. MONTMINY:  Yes, Your Honor.  It is the

12  government's position, Your Honor, as stated in the

13  government's paper in response --

14         THE COURT:  Well, I mean, as part of your entire

15  presentation.  You don't need to do it right now right this

16  second, but go ahead and I will hear whatever you want to

17  say.

18         MR. MONTMINY:  Yes, Your Honor.  Certainly it is

19  the government's position, Your Honor, that the offer of

20  proof that was provided by defense counsel, specifically the

21  dispatch recordings between Sergeant Miller, Brentwood

22  dispatch; Officer Treat, Brentwood dispatch; as well as

23  between Brentwood dispatch and Brevard County, Florida

24  dispatch does not rise to that substantial preliminary

25  showing that there was a specific false statement made

intentionally or with reckless disregard for the truth about
material matters which were included in the search warrant
affidavit.  Specifically, that the defendant is a convicted
felon.  There is nothing contained in these dispatch tapes
which leads to that substantial preliminary finding that the
officers were intentional -- there was an intentional
falsehood placed in the affidavit, nor was there a reckless
disregard for the truth.

The government does concede that the defendant
received a withhold of adjudication in the State of Florida.
But from what was provided by defense counsel, it is the
government's position that they have not met that preliminary
finding that relates to the alleged false statement.

Additionally, Your Honor, as Your Honor is aware,
there is a higher standard for omissions as opposed to the
false statement.  And in this case, the government's position
is that the defense has also not met that lower threshold
showing of an intentional omission or reckless disregard for
the truth in the omission that the defendant received a
withhold of adjudication.  And that also the defense
allegation that there was a failure to include Brentwood
dispatch speaking to Brevard County dispatch in the four
corners of the search warrant affidavit, defense states that
that process is unusual and untrustworthy, the dispatch
talking amongst each other as well as to the officers.  It is

1   the government's position, Your Honor, that that is a normal
2   process that officers use in order to obtain NCIC
3   information.  Officer Treat received the information from
4   Brentwood dispatch as well as from speaking to her
5   supervisor, Sergeant Miller.  It is the government's
6   position, Your Honor, that the defense has not met that
7   preliminary finding for the intentional or reckless disregard
8   for the truth pertaining to the omission that the defendant
9   had a withhold of adjudication, nor that there was
10  intentional reckless disregard for including that information
11  about the process in which Brentwood dispatch spoke to
12  Brevard County, Florida dispatch.
13          So additionally, Your Honor, if the affidavit is
14  in fact corrected to include a fact that the defendant had
15  the withhold of adjudication in the State of Florida, it is
16  the government's view, Your Honor, that based on then
17  existing case law when the search warrant was executed in
18  November of 2012 that the case law at the time particularly
19  in the Eleventh Circuit was that withhold of adjudication
20  would constitute the predicate offense for the defendant
21  being a felon in possession of a firearm under the Tennessee
22  statute that was included in the search warrant affidavit.
23          So, Your Honor, for those foregoing reasons, the
24  government would respectfully state its position that the
25  defense has not met its substantial preliminary showing which

1   would then warrant a *Franks* hearing in this case.

2               THE COURT:  Okay.

3               Mr. Yarbrough.

4               MR. YARBROUGH:  May it please the Court, without

5   attempting to go through the entire case, we would certainly

6   disagree with the government's assertion that there is not

7   enough to go forward with *Franks* hearing on the

8   misrepresentation to the judge who issued the warrant as well

9   as the omission.

10              Just very specifically and briefly hitting those

11  points, the NCIC record that will be submitted as an exhibit

12  shows that the disposition of the case in question in Florida

13  was adjudication withheld.  The actual court record from the

14  Circuit Court of Brevard County has a number of options for

15  little boxes that are checked on the court's order, some of

16  them involving conviction and some not.  And the actual box

17  checked in Mr. Bostick's case states, quote, It is ordered

18  that adjudication of guilt of the above crimes be withheld.

19              We are contending that the common sense

20  interpretation of that language is that there was not a

21  conviction.

22              The other thing that we believe is highly relevant

23  to the issue of the motivation and extent of knowledge of the

24  officer who was the affiant in this case is that the search

25  warrant affidavit which was obtained by the officer contains

1  in the last paragraph last sentence the statement, National

2  Crime Information Center criminal history was assessed by

3  Brentwood Police dispatch which showed that Bostick was

4  convicted of a felony involving deadly weapons in Brevard

5  County, Florida.

6          As I just read to Your Honor, the NCIC report

7  itself does not state that.  In fact, it states the opposite.

8  That adjudication was withheld.

9          Because of that, may it please the Court, and

10  because of the other matters which we have placed in our

11  motion, as well as the transcript which is actually quoted in

12  the motion, we feel that it is clear that Officer Treat, one,

13  either through ignorance or misinterpretation of the law did

14  not understand what adjudication withheld meant and presumed

15  erroneously that it was a conviction, which we say at best is

16  reckless.  At worst, is intentional.

17          What has to be intentional is leaving out the

18  statement of the dispatcher from Brevard County, Florida when

19  she appeared before Judge Beal to acquire the search warrant.

20  There is no mention of any of that conversation in the

21  affidavit.  That has to be intentionally withheld from the

22  judge issuing the warrant.

23          And finally, the false statement that the NCIC

24  report contains a record of conviction, which it does not.

25          So we feel that not only have we met the burden to

1　go forward with the hearing, but that the motion should be
2　granted.
3　　　　　　　THE COURT:  All right.
4　　　　　　　Mr. Montminy, do you have the burden of proof on
5　the motion to suppress?  Do you agree that you have the
6　burden?
7　　　　　　　MR. MONTMINY:  Your Honor, for regarding the
8　*Franks* hearing, Your Honor, of course, as you know, the
9　defense has to establish by a preponderance of the evidence
10　in the course of a hearing.  The government is ready to
11　proceed in this matter.  The government does have its witness
12　available.
13　　　　　　　If I could briefly respond to what Mr. Yarbrough
14　indicated.
15　　　　　　　THE COURT:  Yes.
16　　　　　　　MR. MONTMINY:  If it pleases the Court.  What the
17　dispatch tapes indicate, Your Honor -- and of course the
18　government provided the transcripts and the disk to you in
19　advance of the hearing.  What those disks indicate are the
20　efforts that were employed, the good faith efforts employed
21　by Sergeant Miller to confirm what the victim of the
22　incident, Mrs. Bostick, stated to the officers when the
23　officers met with Mrs. Bostick on the night back on November
24　4, 2012.
25　　　　　　　Additionally, Your Honor, Officer Treat never

spoke to Brevard County, Florida.  She justifiably relied on

what her supervisor, Sergeant Miller, told her as well as

speaking to Brentwood dispatch at around 9:30 that evening.

It is the government's position, Your Honor, that

if the Court finds that there has been a preliminary

substantial showing for a *Franks* hearing that the defense has

to establish the intentional misstatement or the reckless

disregard for the truth by the preponderance of the evidence

standard.  Thank you.

THE COURT:  Well, what I want to do is withhold

judgment whether the defense has met the standard for a

*Franks* hearing.  I want to take up the motion to suppress as

the parties have briefed it and hear argument on that.  We'll

if there is going to be a *Franks* hearing, we'll do that at a

different time.  Certainly what was originally set was the

motion to suppress rather than a *Franks* hearing, so that's

how I want to proceed.

MR. MONTMINY:  And, Your Honor, just so that I can

clarify, Your Honor does not wish to proceed on a joint

*Franks*-suppression motion?

THE COURT:  Well, I want to hear the argument on

the motion to suppress and whether the standard for the

*Franks* hearing has been met.

MR. MONTMINY:  Yes, Your Honor.

THE COURT:  And then if we need to have a *Franks*

1  hearing, we'll do it at a different time.

2          MR. MONTMINY:  Yes, Your Honor.

3          THE COURT:  Do you object?

4          MR. MONTMINY:  Could I have a brief moment, Your

5  Honor?

6          THE COURT:  Okay.

7          MR. MONTMINY:  Thank you, Your Honor.  The

8  government does not have any objection to proceeding as Your

9  Honor wishes to in this matter.

10          THE COURT:  Mr. Yarbrough.

11          MR. YARBROUGH:  If I understand the Court's

12  proposal, Your Honor, we would have the argument on the law

13  regarding the motion to suppress today, and if the Court

14  feels we have met the standard for a *Franks* hearing, then we

15  would have that at a later time.

16          THE COURT:  That's how I thought we were

17  proceeding based on the prior conference.  If you have got an

18  objection to that, let me know now so that we can adjust.

19          MR. YARBROUGH:  We are prepared to do that or put

20  on the witnesses, however Your Honor would like to proceed on

21  that.  We had actually agreed with the government on all of

22  the exhibits that we can stipulate to and introduce without

23  any further discussion, and then we would want the officer to

24  be on the witness stand obviously to be cross-examined by the

25  defense on the issues that we posed in our motion.

 1            THE COURT:  Well, I am going to withhold judgment
 2    about whether there should be a *Franks* hearing or not until
 3    we fully consider the motion to suppress.
 4            MR. YARBROUGH:  All right.
 5            THE COURT:  As I understand it, the government
 6    has got the burden to prove that it acquired the evidence in
 7    appropriate way, and the government can call whatever
 8    witnesses or rely on the exhibits, however, and then you
 9    can --
10            MR. YARBROUGH:  That's fine with us.  Yes, thank
11    you.
12            THE COURT:  Okay.
13            Mr. Montminy, how do you want to proceed?
14            MR. MONTMINY:  Could I have a brief moment, Your
15    Honor?
16            THE COURT:  Sure.
17            MR. MONTMINY:  Your Honor, at this time the
18    government would respectfully call Sergeant Dustin Miller
19    from the Brentwood Police Department as a witness.
20            The government would also respectfully invoke the
21    Rule in this case.
22            THE COURT:  All right.  Invite the witness in.
23            And the government has invoked the rule that any
24    witnesses that are here to testify need to step out until it
25    is their time to testify.  Obviously the parties can be

1  present.

2                    GOVERNMENT'S PROOF

3                     DUSTIN MILLER

4  was called, and being first duly sworn, was examined and

5  testified as follows:

6                    DIRECT EXAMINATION

7  BY MR. MONTMINY:

8  Q.   Good morning, sir.  Make yourself comfortable, and

9  please introduce yourself to Judge Campbell.

10 A.   Your Honor, my name is Dustin Miller, and I am a police

11 sergeant with the City of Brentwood Police Department.

12 Q.   How long have you been a police officer for?

13 A.   I started as a police officer in November of 1992, so

14 getting close to 24 years.

15 Q.   Are you in a specialized unit?

16 A.   I am in patrol.

17 Q.   Could you briefly describe to the Court briefly your

18 experience you have investigating firearm cases.

19 A.   Over the last, say, close to 24 years, I have worked in

20 different departments within the police department.  I have

21 worked in administration.  I have worked in investigations.

22 I have worked in patrol.  And over that course of period of

23 time, I have dealt with different cases that dealt with

24 firearms.

25 Q.   I'd like to direct your attention to November 4, 2012 at

1  around 5:55 p.m. late that afternoon.  Were you working that

2  day?

3  A.    I was.

4  Q.    Where were you working?

5  A.    As the supervisor of the shift, the size of the town, we

6  don't work a particular zone as the supervisor.  We work the

7  entire city and we go back and forth to the people that get

8  calls to check on them, so I would have been working the

9  entire city that day.

10 Q.    On that day, did you conduct an investigation involving

11 a person who later became known to you as Jerry Christopher

12 Bostick?

13 A.    I did.

14 Q.    Do you see that person in court today?

15 A.    I do.

16 Q.    For Judge Campbell would you kindly point to him and

17 describe an article of clothing that he is wearing.

18 A.    Your Honor, Mr. Bostick has a blue coat and yellow tie.

19         MR. MONTMINY:  Let the record reflect the witness

20 has identified Mr. Bostick.

21         THE COURT:  Granted.

22 BY MR. MONTMINY:

23 Q.    Is everything that you are going to mention to Judge

24 Campbell this morning, did all of this take place in the

25 Middle District of Tennessee?

1  A.    It did.  Brentwood, Tennessee, Williamson County.

2  Q.    Describe to Judge Campbell how your interaction or how

3  you began the investigation of Mr. Bostick on November 4,

4  2012.

5  A.    That particular night, we were out on patrol.  I had

6  officers out in different districts or areas, and we were

7  pretty busy.  We got a call that there was a domestic that

8  was in progress at the house in Princeton Hills.  Originally

9  Officer Amber Treat was dispatched to that call.

10           We usually dispatch two units to domestic violence

11 calls because of the nature of what's going on.  And

12 according to the caller at the time, an assault had taken

13 place.  And so I went to back Officer Treat up on that call

14 so there would be a second officer on the scene.

15           Ultimately I would have shown up at the scene

16 anyway because it is one of those calls that by our policy I

17 have to show up to determine what's going on and to assist.

18 Q.    What happened next?

19 A.    I remember on the way to the call, the dispatcher, Linda

20 Al-Sangar, told us that Mrs. Bostick had left the house.  And

21 so at that point in time, things had calmed down a little

22 bit, and I asked or I requested that she ask Mrs. Bostick to

23 meet us in the high school parking lot, which is across the

24 road from Princeton Hills Subdivision.

25 Q.    So what happened next?

A.   At that point, I remember that Officer Treat and I
arrived around the same time.  I believe I pulled into the
parking lot first.  I don't know who checked on the scene
first, but I do remember Officer Treat and I arriving around
the same time.  And we had a discussion with Mrs. Bostick
about what had occurred at the house.

Q.   And just so that we're clear, where did you have that
discussion with Mrs. Bostick?

A.   It was the parking lot of Brentwood High School off of
Murray Lane, and it is across the street from the subdivision
where they lived.

Q.   Did Mrs. Bostick say anything to you?

A.   She explained to us that there had been an argument.
That she had been assaulted.  She told us that she was trying
to leave the house and that Mr. Bostick had shut the door,
striking her in the head.  I noticed a nickel-sized mark on
Mrs. Bostick's head.

      MR. MONTMINY:  Let the record reflect that the
witness pointed to the right side of the temple.

Q.   What happened next?

A.   At that point in time, I believe Officer Treat continued
to ask other questions, and we decided that we should go to
the house and try to figure out the rest of what was going
on.  To find out Mr. Bostick's side of the story.

Q.   Did you go to the house?

1  A.   We did.

2  Q.   So who ended up going to the house?

3  A.   Originally Officer Treat and I went to the house.

4  Q.   With Mrs. Bostick?

5  A.   Yes.

6  Q.   Do you remember the address?

7  A.   I don't.  I don't remember the exact address.

8  Q.   What happened next?

9  A.   The next thing that I remember is we get to the house.

10 Mr. Bostick is not at the house.  And we go inside.

11 Q.   Then what happens?

12 A.   Officer Treat continues to ask questions about what's

13 going on.  I know that there was a lot of back and forth

14 questions about what had happened, I guess.  So in other

15 words, we were doing a preliminary investigation at that

16 point in time.

17           And I remember we were standing in the kitchen

18 getting and gathering all of this information, and Mrs.

19 Bostick stated to us that the way she put it was that Mr.

20 Bostick was a felon and that he was not allowed to have

21 firearms and that there were several firearms in the house

22 and that she could show them to us.

23 Q.   Did she make any other statements at that point in time

24 regarding firearms?

25 A.   I remember her explaining to me that Mr. Bostick

couldn't purchase firearms on his own and that she had
previously bought at least one particular firearm for him
because he couldn't buy the firearm himself.

          She also told me that there was a male, an
individual that worked at the Kia dealership in the
maintenance shop that had bought several guns for him in the
past, again because he couldn't buy those guns on his own
because he was a felon.

Q.   When she was speaking to you, how would you describe her
demeanor?

A.   I would say she was calm at that time.  She wasn't calm
when we first arrived there was a little bit shook up, but at
that point in time everything had kind of calmed down, and
she was just explaining to us what all had happened.

Q.   So then describe to the Court more specifically if there
is anything else about her demeanor when you initially met
her at the parking lot earlier that afternoon?

A.   I would say that she was a little bit upset, but at the
same time I wouldn't say that she was overly upset.  She just
explained to us what all had happened.

          And our concern at that time was to make sure
everything was okay in the home.  There were children there
at the home, so we wanted to go back to the residence to make
sure everything was okay with the children and also speak to
Mr. Bostick.

1    Q.    So we'll get back to now the chronology where you are

2    back into the house and she is speaking to you inside the

3    home.  Was the defendant, Mr. Bostick, physically there at

4    the time when you spoke with Mrs. Bostick inside the

5    residence?

6    A.    He was not.

7    Q.    And after Mrs. Bostick made those statements about the

8    defendant I believe you said as a felon and she purchased a

9    firearm for him, what, if anything, happened next?

10   A.    She had told us that she would show us where a couple of

11   firearms were.  And at that time we followed her to the

12   master where she identified as the master bedroom, and she

13   lifted up the left side of the bed.  Pulled a pistol out from

14   there under the mattress.  And then also pointed to behind

15   the left bedpost, and there was a rifle behind that propped

16   up against the wall behind the bedpost.  It was an AR-15

17   style weapon.

18   Q.    Was there any ammunition that was recovered in the

19   master bedroom?

20   A.    There was.

21   Q.    Did Mrs. Bostick make any statements to you about who

22   possessed the guns?

23   A.    She had told us that they were Mr. Bostick's.  In fact,

24   she told us that the AR-15 was the weapon that she had bought

25   for him because he couldn't buy the weapon on his own.

1  Q.   Did she make any other statements about firearms beyond
2  what you have already mentioned?
3  A.   She explained that there were other firearms in the
4  house.  That she believed there were firearms in two
5  different safes that were in the downstairs area of the
6  house.
7  Q.   Just so that we can clarify or visualize this for the
8  Court, it was the master bedroom on the main level of the
9  home?
10 A.   It was.
11 Q.   What happened -- you indicated that she made reference
12 to additional firearms, so what happened next?
13 A.   After she had said that, we also went downstairs, and
14 she showed us where the safes were in the downstairs area of
15 the house.  One of the safes was in a room in the downstairs
16 area, and the other one was almost behind like what you'd
17 call a vent.  It had to be taken out of the wall.  So it was
18 almost like a false room, really nothing there, no way in
19 except through the vent that I could tell.  And she showed us
20 where those were, where the safes were.  And at that time, we
21 went back upstairs.
22         Mrs. Bostick said she didn't have a combination
23 for those safes.  That she didn't have access to them.
24 Q.   From your observations of the safes, would it be
25 possible to store firearms in those safes, from your view of

1  them?

2  A.    It would.

3  Q.    What happened next?

4  A.    I remember we went back upstairs, and we continued to

5  gather information.  Officer Treat is gathering information

6  because she is also filling out a report, filling out

7  domestic violence forms.  Lots of different things are going

8  on at that time.  There is pictures to be taken.  There are

9  reports to be done.  There is actually waivers that we hand

10 over advising domestic violence victims what their rights

11 are, what we can do for them, things that we can provide for

12 them.  So all that stuff is going on at that time.

13 Q.    Was Mrs. Bostick asked to provide a written statement

14 about the firearms that she mentioned?

15 A.    I don't remember if she was asked to provide a written

16 statement.  I do remember she gave a statement.  And I had

17 mentioned to Officer Treat that what I would prefer is that

18 we have the audio on our recording going on so we could

19 capture that as well.

20 Q.    And then what happened next?

21 A.    I believe at that point what I did was ask our

22 dispatcher to run a criminal history to determine whether or

23 not Mr. Bostick had been convicted of a felony.

24 Q.    Describe to Judge Campbell the process of contacting

25 dispatch to determine criminal records of targets or suspects

1  that you are investigating.

2  A.   So what we do is we actually contact via the radio or

3  sometimes make a phone call to our dispatchers and ask them

4  to run a criminal history check on a particular individual

5  that we have questions about.  It is a very guarded type of

6  thing.  In other words, I can't go in there and run it

7  myself.  I can't go to my patrol car and run it myself.  You

8  have to have a certification to run that type of history, and

9  in fact you have got to give a reason why you are running the

10 history.  At that time, you had to sign a log book saying

11 that you ran this history or you requested this history, and

12 they are very strict about disseminating the information from

13 that.  In other words, if I take the piece of paper out of

14 the dispatch office, then I have to actually they have to

15 sign it out to me saying it is going to a file or for some

16 other purpose, maybe for court or things like that.

17          So it is something we do by calling a dispatcher

18 and asking them to do it.  They have a certification course

19 that they go through to learn to do that NCIC checks.  What I

20 have is called a query certification.  And in that

21 certification, I run tags and I run driver's licenses, and I

22 can check Metro records Nashville.  I can check local types

23 of things, but I can't get an actual history from state to

24 state to state.

25 Q.   So you are saying that you don't have direct access

1  yourself to NCIC?

2  A.   I have direct access to NCIC, but I don't have access to

3  a Triple I or a criminal history.

4  Q.   Describe the difference a little bit more.

5  A.   Okay.  So I have NCIC in my car, and I can run tags.  By

6  punching a tag number, I can find out who the car belongs to,

7  what the VIN number is on the car.  I can find out all of

8  those types of things.

9           I can run a driver's license.  If someone has a

10  warrant for their arrest, it will notify me.  In order to

11  find out an actual history of what's happened along someone's

12  lifetime, say, in another state or Tennessee, I have to

13  request that a dispatcher run that for me.

14  Q.   And is that common practice for you during your time in

15  law enforcement to reach out to dispatch to obtain that

16  additional information?

17  A.   It has been that way ever since I have been doing the

18  job.

19  Q.   You indicated that in this case you did reach out to

20  dispatch.  And, again, clarify to the Court why you decided

21  to contact dispatch.

22  A.   The reason that I contacted dispatch was because of the

23  information that I had received from Mrs. Bostick explaining

24  or stating that Mr. Bostick was not allowed to have firearms.

25  And continuing, she told me that she had actually purchased

1  firearms for him in the past.  She also elaborated on the
2  fact and told me that an individual that he worked with had
3  also bought other firearms for him because he couldn't buy
4  them on his own because he was a felon.
5  Q.   What happened next?  Did you make the call?
6  A.   I made that call.  And they don't give us the
7  information back typically in detail over the radio.  They
8  give back some of it over the radio.  But I remember I was
9  requested to contact the dispatcher.  I did that by phone.
10  Spoke with them.  We discussed what was on the NCIC printout.
11  And the dispatcher, Linda Al-Sangar, told me that she thought
12  that there was a felony on the record.
13  Q.   What was your experience with Ms. Al-Sangar at the time
14  back in November 4 of 2012?  Had you worked with her a lot
15  during the course of your time at Brentwood Police
16  Department?
17  A.   Ms. Al-Sangar had worked at the police department -- she
18  worked there for 25 years total, and I had worked with her
19  for probably about 14 years at that time.  And my dealings
20  with her was she was always a very good dispatcher, and I
21  can't remember one time that she ever gave me one piece of
22  bad information ever.
23  Q.   Did you commonly work with her was it on a every-day
24  basis, every other day?  How would you describe?
25  A.   It really would depend on what shift I was working that

 1  year, but you could say over my course of 18 or so years at
 2  the police department or at that time 15 years at the police
 3  department, I had probably worked with her probably half the
 4  time or a little over half the time.  In other words, our
 5  days off may have been different.  Our shift may have been
 6  different.  But I did regularly work with her.
 7  Q.   Have you had the occasion to listen to the call that you
 8  placed to Ms. Al-Sangar that evening?
 9  A.   I have.
10  Q.   Have you also had the occasion to review the transcript?
11  A.   I have.
12  Q.   And we'll get to this a little bit later, but did you
13  make additional phone calls or communicate with Ms. Al-Sangar
14  beyond one time that night?
15  A.   I believe there were three different times.
16          MR. MONTMINY:  Your Honor, permission to approach
17  the witness.
18          THE COURT:  Yes.
19  BY MR. MONTMINY:
20  Q.   The government is handing you what has been premarked
21  and already shown to defense counsel as Government's Exhibit
22  1 for identification.  If you could take a look at that
23  exhibit first.  Do you recognize that?
24  A.   I do.
25  Q.   What is it?

1    A.   This is a actual copy of the recordings that I initialed
2    just last night to verify that it was what I had listened to.
3    Q.   Do the calls contained on that disk fairly and
4    accurately represent the calls that you made to Ms. Al-Sangar
5    during the course of the evening of November 4, 2012?
6    A.   They do.
7    Q.   Do you also concede that there are other dispatch calls
8    on that disk that you signed that you did not place yourself?
9    A.   That would be correct.
10   Q.   That would be correct?
11   A.   Talking about on this?
12   Q.   Yes.
13   A.   Oh, no.  These are my calls.
14   Q.   But in addition to your calls, are there also calls to
15   your knowledge that Officer Treat placed to Brentwood on that
16   disk also?
17   A.   Yes, there is other calls on the disk.
18          MR. MONTMINY:  Your Honor, at this time -- and for
19   the record, what the government has provided to the witness
20   as Government's Exhibit 1 is a duplicate copy of what was
21   attached to the government's filing as Government's Exhibit 1
22   which is provided to Your Honor's chambers.
23          THE COURT:  Yes, I have this copy of the disk if
24   you want to see it.
25          MR. MONTMINY:  Yes, Your Honor.  At this time,

1  Your Honor, for purposes of this hearing, the government

2  would move Government's Exhibit 1 for I.D. into evidence.

3          THE COURT:  Any objection?

4          MR. YARBROUGH:  No objection.

5          THE COURT:  Granted.

6  BY MR. MONTMINY:

7  Q.   The government has also provided a composite exhibit,

8  Government's Exhibit 4A for identification.  Do you -- that

9  has already been shown to defense counsel.  Do you recognize

10 that?

11 A.   I do.

12 Q.   What is it?

13 A.   It is actually a transcript of the calls that I placed

14 to the dispatcher.

15 Q.   And do they fairly and accurately represent the

16 transcripts of the calls that you placed?

17 A.   They do.  And I actually reviewed the calls, went

18 through the transcript and initialed the bottom of each page

19 to show that I had reviewed them.

20         MR. MONTMINY:  The government would respectfully

21 move Government's Exhibit 4A for identification into evidence

22 at this hearing.

23         THE COURT:  Granted.

24         MR. MONTMINY:  Your Honor, the government has

25 provided a courtesy copy of Government's Exhibit 4A to

1   defense counsel.  And with the Court's permission, the
2   government will hand to you a copy as well.
3               THE COURT:  Okay, thank you.
4               MR. MONTMINY:  Yes, Your Honor.
5               THE COURT:  Is this the same transcript that is
6   attached to the various filings?
7               MR. YARBROUGH:  That's what we understand.
8               MR. MONTMINY:  Yes, Your Honor.  Just so the
9   record is clear, there has been no changes to any of the
10  transcripts that the government -- was subsumed into the
11  government's response.  There has been no changes to what the
12  government will be providing the Court today in this case.
13              THE COURT:  Okay, thank you.
14              MR. MONTMINY:  Yes, Your Honor.  Also just for the
15  record, Your Honor, that is with the defense permission, that
16  is the entire that would be Government's Composite 4A, 4B and
17  4C.  That's the entirety of all the transcripts.
18              THE COURT:  Okay, thank you.
19              MR. MONTMINY:  With the Court's permission,
20  permission to play the first track of the disk.
21              THE COURT:  Go ahead.
22              (Audio played.)
23  Q.   Sergeant Miller, after you got off the phone with
24  Brentwood dispatch Linda Al-Sangar, what, if any, conclusion
25  did you reach, if at all, based on that phone call?

A.   I had reached the conclusion at that point that she had
said that there was a felony on his record and that there was
conviction for it.
Q.   What led you to that conclusion?  Explain that based on
your training and experience as a law enforcement officer,
explain to Judge Campbell why you came to that conclusion.
A.   So what we generally do is when we are looking for a
criminal history, we look to find out if there is a charge.
Then we go from there, and we look down and we look for a
disposition in the matter.

          If there is a disposition in the matter, say court
costs, fines, time served, things like that, when we look at
that, that to us equates as a conviction.
Q.   Did you understand from the dispatch call that the
Florida carrying concealed weapon charge resulted in a
felony, was a felony?
A.   I am sorry, I didn't understand.
Q.   Did you conclude that the carrying concealed firearm
case out of Florida was a felony?
A.   I did.
Q.   And you also made a determination -- what other
determination did you make, just so it is clear on this?  Let
me rephrase the question.  Did you conclude that it was a
conviction?
A.   I did.

1  Q.   In your 24 years or your time in law enforcement, have

2  you encountered a situation where there would be a sentence

3  from NCIC that results in probation and court costs

4  pertaining to a felony that would not amount to a conviction,

5  would not equate to a conviction?

6  A.   I never have.  In fact, in the State of Tennessee, the

7  only thing that we have -- and this is all after the fact

8  that I have learned the only thing that I think would even be

9  close to what was called adjudication withheld would be like

10  a pretrial diversion type situation.  But even in that, when

11  a pretrial diversion in the State of Tennessee goes through,

12  the arrest is on the person's record.  But where it says

13  disposition or con-- it doesn't say any disposition, and it

14  doesn't give any court cost.  That would equate to us that it

15  doesn't count.  In other words, it doesn't count as a felony

16  conviction.

17         So in other words, for pretrial diversion in

18  Tennessee, it is either there and they don't do what they are

19  supposed to do and it is on their record, or they do what

20  they are supposed to do and it is not on their record.  In

21  other words, meeting the fulfillment of the pretrial

22  diversion agreement.

23  Q.   At that point in time after this phone call, did you or

24  did you not in your own mind as an officer, did you possess

25  probable cause that the defendant was a convicted felon?

```
 1  A.    Absolutely.
 2  Q.    Can you explain on that.  Can you elaborate additionally
 3  if there is anything else to mention to the Court if there is
 4  anything else.
 5  A.    Probable cause is my definition has always been more
 6  probable than not.  I definitely believe that I had probable
 7  cause at that point in time to believe that Mr. Bostick was a
 8  convicted felon.  His wife had told me that he was.  She had
 9  elaborated further saying that he had had -- that she had
10  bought a firearm for him because he couldn't legally buy it
11  or obtain it himself.  She had also told me that there was an
12  individual that worked at the Kia dealership that had also
13  bought, she said, several weapons for him.
14            And also I had contacted our dispatcher, which is
15  our normal routine way of doing things.  Asked them to check
16  the criminal history.  And she came back and told me yes,
17  that there is a felony on the record and that there was a
18  disposition in the matter.
19  Q.    And just so that we're clear, when you say the word
20  disposition, in your mind from your training and experience,
21  does that equate with a sentence?
22  A.    It does.
23  Q.    After this phone call with dispatch, what, if anything,
24  did you do next?
25  A.    The next thing that I did was contact my supervisors,
```

and that's what I do.  It is kind of like a routine.  I get
all the facts and go from there.  But I contacted my
lieutenant; name is Ricky Knight.  Contacted him and told him
what all we had going on.  Explained the situation at the
house.  Talked about the domestic.  We talked about the
weapons.  And he also, and this is normal too, told me to go
ahead and pass it along to your police captain and to let him
know what was going on as well.

So I made a phone call to the police captain,
Captain David O'Neil, and I contacted him.  Captain O'Neil is
also an attorney, so we run a lot of things by him over the
course of our shifts.  But told them what all was going on.
I remember explaining to Captain O'Neil that there was a
phrase used *adjudication withheld* in one of the things and
that I wasn't exactly sure what that meant.  And so we
determined that we would make sure and try to contact Brevard
County or somewhere in Florida that could interpret the NCIC
entries that they make themselves.

Q.   Regarding at this juncture in the chronology of that
evening, in your mind did you have probable cause to believe
that there were additional firearms that were in the
residence, additional firearms beyond the firearms that you
saw with your own eyes in the master bedroom?

A.   I did.

Q.   And based on what you indicated earlier, is there

1  anything additional to that?

2  A.   Mostly what I just said earlier.  It is a matter that I

3  thought that more probable than not there were more weapons

4  in the house.  She had already told me there were some and

5  showed me where some were.

6  Q.   So what happened next?

7  A.   I remember that Officer Treat continued to gather

8  information and continued to get stuff together for her

9  report.  And at that point, I also I contacted dispatch, or

10 they called me.  I don't remember which one.  But in the next

11 conversation I had with our dispatcher, Linda Al-Sangar, I

12 asked her if she would contact someone in Florida.  And

13 she --

14 Q.   What made -- I didn't mean to interrupt you.  Go ahead.

15 A.   So she did that.

16 Q.   What prompted you to contact dispatch to ask dispatch to

17 reach out to Florida?

18 A.   Well, it is pretty routine for us to call other states

19 when we have stuff that we don't understand or that doesn't

20 mean anything to us in Tennessee.  Given the example before

21 like with Kentucky, because Kentucky is a commonwealth, there

22 are certain things they do a little bit different, and there

23 are certain things that they put a little different on their

24 stuff.  Also Alabama, there is a few differences.  Georgia,

25 there is a few differences.  But we deal with those a lot,

1   and we don't deal with Florida a lot so I felt it would be a
2   really good move to call these people and let them interpret
3   the entry for us because that's their entry, not ours.
4   Q.    Why is it that you deal with Kentucky, Georgia and
5   Alabama more?
6   A.    Really because of the interstate and the people coming
7   through are coming from those states.
8   Q.    Just so that we're clear on this, had you ever
9   encountered the term *withhold of adjudication* before prior to
10  November 4 of 2012?
11  A.    Never.
12  Q.    Have you had any law enforcement experience in the State
13  of Florida?
14  A.    No.
15  Q.    Have you had any training in Florida as a law
16  enforcement officer?
17  A.    No, sir.
18  Q.    Had it oftentimes been -- have you oftentimes had to run
19  NCIC of a Florida suspect during your 24 years as an officer?
20  A.    Maybe a handful of times.
21  Q.    So you indicated that you called dispatch back again.
22  Is that what you are saying?
23  A.    Yes.
24          MR. MONTMINY:  Your Honor, permission to play the
25  second clip.

```
 1                THE COURT:  Go ahead.
 2                (Audio played.)
 3                MR. MONTMINY:  And then for the record, Your
 4   Honor, the government will play the next clip in Government's
 5   Exhibit 1, which is a continuation of the phone call.
 6                THE COURT:  Okay.  Go ahead.
 7                (Audio played.)
 8   Q.   Let me pause this for a brief moment.  Who are you
 9   speaking to right now?
10   A.   I am out on the front porch, and there is another
11   officer that has shown up; his name is Austin Kearn.  It
12   appears -- and I can't tell you exactly all the conversations
13   that I had, but time doesn't stop when I am at a scene.  And
14   I am -- I have a lot of employees that I am working with and
15   checking up on and keeping tabs with, and so a lot of the
16   time while I am there, I am answering the telephone,
17   answering calls for other people, answering questions for
18   them and then going back to what I am doing there.  Some of
19   that is back and forth with him as well I would be talking
20   and then talk to him, go back to what I was doing.  So that's
21   what's going on at that point.
22   Q.   Were you the supervisor on scene that day?
23   A.   I was.
24   Q.   Describe to Judge Campbell the difference in your role
25   versus the role of Officer Treat that evening.
```

A.   I had mentioned earlier originally went to the call to

back her up because we were short handed.  We didn't have

enough people to send a second car.  We always send a second

car on domestic violence calls, so I originally went for that

reason.  But I always have to show up at domestic violence

scenes or reported domestic violence scenes, and I have to

show up because there is different things that we have to

determine.  And by our policy, a supervisor shows up.  There

are volatile situations.  There is a lot of stuff that's

going on, a lot of dynamics that are happening, and that just

assures a level-headed person with a little more knowledge

and training about those laws.  So that's why I am there in a

supervisor capacity and to help instruct the officers when

they need help.

                (Audio played.)

Q.   To your knowledge, subsequent to that phone call, did

Brentwood dispatch reach out to Brevard County, Florida

dispatch?

A.   Prior to this call?

Q.   After the call that we just heard.

A.   After this call, they did.

Q.   Were you on the phone listening to the call between

Brentwood dispatch and Brevard County, Florida dispatch?

A.   I was not.

                MR. MONTMINY:  Your Honor, at this time the

```
 1   government would respectfully move Government's Composite
 2   Exhibit 4B which has been shown to defense counsel, which are
 3   a copy of the government's version of the transcripts of the
 4   phone calls between Brentwood, Tennessee dispatch and Brevard
 5   County, Florida dispatch for purposes of this hearing.
 6               THE COURT:  Okay.  Granted.
 7               MR. MONTMINY:  And Your Honor has a copy of those
 8   calls.
 9               THE COURT:  Yes.  Filed as Docket Number 14.
10               (Audio played.)
11               MR. MONTMINY:  Then for the record, we'll play the
12   next clip, which is a continuing call.
13               THE COURT:  Go ahead.
14               (Audio played.)
15               MR. MONTMINY:  For the record, the government will
16   play the next clip, which is a continuing call.
17               THE COURT:  Go ahead.
18               (Audio played.)
19               MR. MONTMINY:  For the record, the government will
20   play the next clip, which is a continuing call.
21               THE COURT:  Go ahead.
22               (Audio played.)
23   Q.   Sergeant Miller, did you recall having any additional
24   conversations with Brentwood dispatcher Linda Al-Sangar that
25   evening?
```

1  A.   I did.

2          MR. MONTMINY:  The government would play the next

3  clip, Your Honor.

4          THE COURT:  Go ahead.

5          (Audio played.)

6  Q.   Now, Sergeant Miller, it is my recollection that you

7  stated earlier this morning that after an earlier call with

8  Ms. Al-Sangar, in your mind you had probable cause to believe

9  that the defendant was a convicted felon.  Did that analysis

10 change, if at all, after this call that we just played a

11 second ago?

12 A.   No, it didn't change at all.  In fact, I had her make

13 that call because I just wanted to make sure of what we were

14 doing.  And I felt confident after speaking with her then

15 that that's what had actually happened is that she had gotten

16 the information that I had requested and that they had

17 confirmed with her that it was a felony conviction.

18 Q.   Did your confidence level increase after this call that

19 we just listened to a moment ago?

20 A.   I believe so, yes.

21 Q.   And could you explain why to the judge.

22 A.   Well, I explained earlier probable cause more probable

23 than not, and every step that I took from one step to the

24 next made me more confident that we were correct.

25 Q.   What happened after you spoke with Ms. Al-Sangar on the

1  call that we just listened to a moment ago, what happened
2  next?
3  A.   Again, the reports and things are still being worked on.
4  I make phone calls back again to my lieutenant.  Explained to
5  him what all has transpired to that point.  I also call
6  relate those things to my captain, Captain O'Neil.  And after
7  that, I remember speaking with Officer Treat and explained to
8  her what that I had gotten information from dispatch that
9  there was a felony conviction and that I wanted her to
10 contact Captain O'Neil herself and discuss all of the details
11 of everything with him because I didn't want to be an
12 in-between person in that because I knew he would be
13 assisting with drawing up a search warrant.
14 Q.   Let me slow you down for a brief moment and cover a few
15 of the issues you just referred to.  What specifically did
16 you tell Officer Amber Treat regarding the information that
17 you learned from Brentwood dispatch?
18 A.   I don't remember the specific words that I used, but I
19 do remember telling her that we had checked, and there was a
20 felony conviction.
21 Q.   And then you also made reference to the fact that David
22 O'Neil would be working on this matter as well.  Could you
23 explain that to Judge Campbell.
24 A.   Officer Treat had never drawn up a search warrant.  She
25 had also never served a search warrant up to that point.  And

1  it is a practice of our department to allow our captain, who
2  is an attorney, to assist in drawing those documents up.  He
3  is pretty specific about the way he goes through that and the
4  way that he gathers all of that information.  And he always
5  goes back through and makes sure is this what you are trying
6  to tell me.  In other words, he has put it into the legal end
7  of it.  And but that's the way that we do it.  It is very --
8  I'd say he's drawn up three-quarters of the search warrants
9  that we've had in our police department in the last five
10 years.  Maybe more.
11 Q.  To your knowledge, after the conclusion of the call that
12 we just listened to, was Officer Amber Treat still physically
13 at the Bostick residence in Brentwood?
14 A.  She was.
15 Q.  How long would you estimate that you say that you
16 remained on scene after this last call that we listened to
17 between you and Brentwood dispatch?
18 A.  I don't know exactly.
19 Q.  So what, if anything, happened next?
20 A.  I believe I mentioned that I had called both of my
21 supervisors.  After that, I do remember asking another
22 officer to assist Officer Treat in getting the paperwork set
23 up because she had a lot of stuff to do.
24 Q.  Just so we're clear, her role was to write the reports?
25 A.  Her role was to write the reports, to fill out all of

1   the reports, to do the documentation.  So there is a lot of

2   things that go on.  I mean, you actually have an active crime

3   scene, so there are actually sometimes there are crime scene

4   reports that are done.  You have a domestic violence

5   situation, so you already have two or three more documents

6   that have to be filled out that aren't filled out on other

7   types of calls.  You also have a more detailed narrative, so

8   that's going to take longer.  It is a little more detailed of

9   a report.  So there is just a lot of stuff going on at the

10  same time, and I had one of the other officers fill out what

11  we call the domestic violence forms and present those to Mrs.

12  Bostick.

13  Q.   As the supervisor on scene and Officer Treat writing the

14  reports, in those circumstances where you are the officer on

15  scene, is it common for the officer generating the reports to

16  have to rely on what you tell the police officers?

17  A.   It is.

18             MR. MONTMINY:  Can I have a brief moment, Your

19  Honor?

20             THE COURT:  Yes.

21             MR. MONTMINY:  Judge, no further questions for

22  this witness at this time.  Thank you.

23             THE COURT:  Mr. Yarbrough.

24             MR. YARBROUGH:  Yes, Your Honor.  Thank you.

25

                    CROSS-EXAMINATION

BY MR. YARBROUGH:

Q.    Sergeant Miller, good morning.

A.    Good morning.

Q.    Now, your name is Dustin, D-u-s; is that right?

A.    Yes, sir.

Q.    I noticed the transcript had it Justin in one place.

A.    I believe the old transcript did, the one that y'all put

together.

Q.    It has been corrected?

A.    Yes, sir.

Q.    Okay, good.  And you are a sergeant.  You have been on

the department 24 years; is that right?

A.    I have been in Brentwood almost 19 years.

Q.    Okay.

A.    Before that, I worked in Rutherford County.

Q.    All right, sir.  And I believe you said you had

experience in firearms cases?

A.    Yes, sir.

Q.    All right, sir.  As a result of that, have you had some

of the training that some of the ATF provides regarding

firearms investigations?

A.    No, sir.

Q.    Have you ever had any training at all in firearms

investigations?

1    A.    It has probably been talked about, but we don't -- I
2    have not been to a specific school on firearms training in
3    regards to firearms cases.
4    Q.    All right.  In all of your experience and your training,
5    Sergeant Miller, have you ever come across the fact in
6    Tennessee a person with a felony conviction cannot sell
7    automobiles?
8    A.    No, sir.
9    Q.    You didn't know that?
10   A.    No, sir.
11   Q.    But you did know that Mr. Bostick was engaged in the
12   selling of automobiles?
13   A.    Yes, sir.
14   Q.    At the time of this case, he was a pretty well-known
15   figure in Brentwood and really throughout Middle Tennessee
16   because of his television commercials where he was
17   advertising for a Kia dealership in Franklin; is that right?
18   A.    Yes, sir.
19   Q.    And you knew who he was?
20   A.    Yes, sir.
21   Q.    And you knew he was associated with a dealership in
22   Franklin?
23   A.    Yes, sir.
24   Q.    But you were not aware of the fact that he could not
25   have been associated with them had he had a felony

1  conviction?

2  A.   No, sir.

3  Q.   All right.  The testimony that you gave earlier about

4  being at the scene, I believe you said that Mrs. Bostick is

5  the one who told you that he was a convicted felon; is that

6  right?

7  A.   Yes, sir.

8  Q.   You had no other information at that time to base that

9  on, did you?

10  A.   At that time, no, sir.

11  Q.   Would I be correct in saying, sir, that Ms. Bostick at

12  that point in time was quite angry with her husband?

13  A.   There was a domestic going on.  I'd say she was angry.

14  At that particular time, though, she was rather calm.  Things

15  had calmed down substantially.

16  Q.   She called police, right?

17  A.   Yes, sir.

18  Q.   And she complained that she had been hit with the door

19  as she was trying to leave, right?

20  A.   Yes, sir.

21  Q.   And so based on her statement alone, you began to

22  consider that Mr. Bostick was a felon and that possession of

23  those firearms in his home would be a crime; is that right?

24  A.   Began to consider, yes, sir.

25  Q.   As a matter of fact, the DA in Franklin -- well, not the

1  DA, but I guess the officer went and got a warrant for the
2  State charge of felon in possession of a firearm; isn't that
3  right?
4  A.   Yes, sir.
5  Q.   But that was later dismissed when it was shown that Mr.
6  Bostick was not a convicted felon, correct?
7  A.   I don't know about that.
8  Q.   You don't know the disposition of that case?
9  A.   No, sir.
10 Q.   Did you later learn any more about Mrs. Bostick's
11 statements concerning this AR-15 that you testified about?
12 A.   I don't understand what you are asking.
13 Q.   After the evening that you were at the house, Sergeant
14 Miller, did you have any other connection with this case for
15 the now three and a half years that it has been pending?
16 A.   No, sir.
17 Q.   So you are not aware of the fact that Mrs. Bostick
18 actually was not telling you the truth about whose weapon
19 that was at that time?
20 A.   No, sir.
21      I was the supervisor that was there that night.
22 When my work is done, I go home.
23 Q.   Okay.  That's fine.
24 A.   I know nothing else about it.
25 Q.   I don't know whether you are aware of it or not, so

1 that's why I have to ask you.
2 A.   Yes, sir.
3 Q.   So you haven't kept up with the investigation, and you
4 don't know any of the information that the ATF has
5 accumulated before they brought this indictment just a few
6 months ago?
7 A.   No, sir.
8 Q.   Now, Sergeant Miller, let me ask you a few specific
9 questions now about this lengthy effort to contact Brevard
10 County, Florida and see if there was really a felony or not.
11 Were you ever told that there was an adjudication withheld?
12 A.   Yes, sir.
13 Q.   And is your testimony that you had no idea what that
14 meant?
15 A.   Yes, sir.
16 Q.   Do you know what the word *adjudication* means?
17 A.   I do now.
18 Q.   As a police officer in 2012, you did not know what
19 adjudication meant?
20 A.   No, sir.  I had never heard the word *adjudication* or
21 *adjudication withheld* used.
22 Q.   Have you ever been to juvenile court?
23 A.   Yes.  But not a lot.
24 Q.   Okay.  Are you aware that in juvenile court in Tennessee
25 their final hearings are called adjudication hearing?

A.    Never heard it.  I have never heard that term.

Q.    As a matter of fact, the judge to whom this affidavit and application for search warrant was presented to, Robbie Beal, he was formerly a juvenile referee and judge, wasn't he?

A.    Yes, sir.

Q.    So he would know exactly what that word meant?

A.    I would think so.

Q.    But that word is nowhere in the affidavit, is it?

A.    No, sir.  I didn't write the affidavit.  I only reviewed it.

Q.    I understand that, sir.  Did you ever look at the court record from Brevard County on this case that you say was a felony?

A.    No, sir.

Q.    And why is it that you would not try to get the actual court record rather than rely on this rather sketchy conversation with the dispatcher?

A.    Well, one of the reasons is because in a domestic violence situation, and you have got an individual who has been accused of committing domestic violence has left the house.  So you have got an individual that has left the house.  I am standing in the kitchen.  His wife is telling me her side of the story and statement, and this is what she is telling me is he is on the phone.  He calls, he calls, he

1  calls.  And his name shows up on her phone.  She answers, and

2  he is taunting her saying he is outside the house and can see

3  us and what we're doing inside the house.  That concerned me,

4  so I thought I needed to act quickly as I could to get things

5  done.

6  Q.  Yes, sir.  That would be true as to the domestic

7  violence charge, but you had plenty of basis on which to get

8  that warrant.  And not only could you get the warrant and

9  arrest him; as soon as you found him, he would have a 12-hour

10  hold where he would not be allowed to even leave the jail.

11  Isn't that true?

12  A.  Yes, that's true.

13  Q.  So you didn't need to track down all this business about

14  firearms in order to take care of him, did you?

15  A.  That's just the way that we normally do it.  We ask for

16  criminal history.  And if something comes up, we follow

17  through on what we have been told.

18  Q.  You would normally delay application for delay in a

19  domestic violence case to do investigation on firearms?

20  A.  We were doing it in conjunction with a domestic violence

21  case.

22  Q.  As a matter of fact, the only information you had that

23  there was anything related to a firearm in either one of

24  these safes was the statement of Mrs. Bostick, wasn't it?

25  A.  That would be correct.

1  Q.  Mrs. Bostick was already angry with her husband and was

2  applying for a warrant for his arrest, was she not?

3  A.  We were applying for the warrant; she was not.

4  Q.  Okay.  She was the complaining witness?

5  A.  She was.  She was the complainant, but in the State of

6  Tennessee, the police are the prosecutors in the matter.  The

7  complainant or the individual really has no say in the

8  matter.  We identify whether or not there is a person that is

9  a primary aggressor, and we take all of that into

10  consideration.  And also we have to continue an investigation

11  if the individual that supposedly committed it is not there

12  in an effort to try to find out what their side of the story.

13  And we tried over and over and over to get Mr. Bostick's side

14  of the story that night.  That was kind of what slowed us

15  down to the degree that we were slowed down.  We were trying

16  to get Mr. Bostick's side of the story.

17  Q.  As a matter of fact, Sergeant Miller, you had enough

18  probable cause in your mind right then and there to get this

19  warrant for felon in possession of firearms because you said

20  there was a rifle there in the house that you had already

21  seen with your own eyes.  That would have been enough to get

22  the warrant, wouldn't it?

23  A.  No, sir.

24  Q.  Why not?

25  A.  Because I believe I mentioned earlier that at the point

1  in time that it would be more probable than not, I am still
2  collecting facts and gathering information.
3  Q.   I thought you told the judge earlier that Mrs. Bostick
4  said that that was his gun and that he had had her purchase
5  it for him.
6  A.   I did.
7  Q.   That would be a crime, wouldn't it?
8  A.   Yes.
9  Q.   So is there some reason why you just didn't go ahead and
10 act on that?
11 A.   As far as -- I don't understand what you are asking me.
12 Q.   I am asking you, sir, isn't it true that within a few
13 minutes of talking to Mrs. Bostick, you had the same
14 information that you put in the search warrant that you could
15 have used to go downtown and get an arrest warrant?
16 A.   No, sir, I don't think so.
17 Q.   As a matter of fact, you did get arrest warrants before
18 you found out what was in either safe; isn't that true?
19 A.   Yes, that is correct.  The officer got the warrants at
20 the magistrate's office.
21 Q.   Again, the only information that you had that there
22 might be a gun in either safe was what Mrs. Bostick said?
23 A.   That's correct.
24 Q.   What was the reliability of that that you placed your
25 faith in?

A.   The reliability in that is the accumulation of a lot of
things that had gone on that night.  It wasn't just one
thing.  In fact, we went to a call that was volatile in
nature.  Things were going on.  I understand that it is a
domestic violence case.  But while we're there, she explains
to us that there are weapons in the house.  She explains to
us that he is a felon and that he can't buy guns on his own.
She tells us that someone that worked for him had purchased
several guns for him because he can't buy guns.  She had told
us all of this information.

        And we had also gone through our dispatchers to
confirm that this individual had a felony conviction on his
record.  We were going through all of that information, which
continues to give me more and more information in the matter.
And just to top things off and to try to make sure that I am
doing exactly the right thing, I have our dispatcher contact
Brevard County because, again, in Tennessee on the NCIC
information if we don't see court costs or a disposition of
sorts, then there is not a conviction.  When we see
dispositions, we equate that to conviction.  I wanted to make
sure that we were right on that, so we had them contact
Brevard County, and I believe she confirmed that in the phone
conversation.  Again, I wasn't on the phone with them, but I
have heard the conversation since then through the
transcripts.

1  Q.   I am sorry.  I didn't mean to interrupt you.  I thought

2  you were through.

3  A.   That's okay.

4  Q.   Did you see the NCIC report on Mr. Bostick?

5  A.   Later that night.

6  Q.   Later that night?

7  A.   Yes, sir.

8  Q.   Before you took action?

9  A.   Yes, sir.

10  Q.   Okay.  And what did it say about disposition?

11  A.   Exactly what they said.  Said adjudication withheld.

12  Q.   If you look at a case where a person is found guilty of

13  a criminal charge, under that portion called disposition, it

14  will say guilty, won't it?

15  A.   Sometimes.  Not always.  Different states do it

16  differently.

17  Q.   Well, even on his report, there is one that says

18  dismissed nollied; isn't that right?  There is one that says

19  convicted guilty.  Traffic event, doesn't it?

20  A.   I haven't reviewed that in quite a while, but I can

21  review it if you'd like for me to.

22  Q.   But you knew full well before y'all got this warrant

23  that the NCIC report in Mr. Bostick's case did not say

24  guilty, did not say convicted, but said adjudication

25  withheld, correct?

A.    No, that's not correct.  What's correct, I knew that it
had the words *adjudication withheld* on the copy.  What is
correct is that we called Florida, Brevard County, an agency
there to interpret their entries into the NCIC system.  And
the reason we called them to interpret that is because that's
what they do.  They are in the State of Florida, so they
would know how to interpret that so that would be exactly
what's correct.
Q.    As the supervisor in this case, Sergeant Miller, did you
review the work of Officer Treat before she submitted her
affidavit to the judge?
A.    I did not because that would have been Captain O'Neil.
He would have been the supervisor in charge at that point.
Again, my time, I had an entire shift going on, not just one
call.  So I am dealing with lots of other things that are
going on, different people, different calls.  So when I left
that scene, she was turned over to Captain O'Neil.  That was
the last thing that I asked her to do was to contact Captain
O'Neil and discuss it with him, so the only reviewing that I
would do is reports.  I go through reports, so I would have
reviewed those reports, but I wouldn't have reviewed an
affidavit or all those types of things.  That would have been
Captain O'Neil.
Q.    Then my question will be hypothetical, sir.  If you had
read the affidavit and it says A National Crime Information

1   Computer, NCIC, criminal history was assessed by Brentwood

2   Police dispatch which showed that Bostick was convicted of a

3   felony involving deadly weapons in Brevard County, Florida,

4   would that be a true statement or not?

5   A.   Then I would have said yes, it is.  Now I would say not

6   necessarily because I know what adjudication withheld means

7   now.  But at that point in time, I had no idea what that

8   meant whatsoever.

9   Q.   And if you had reviewed that, you would have known that

10  Officer Treat was not telling the judge that the NCIC report

11  actually said adjudication withheld; isn't that true?

12  A.   If I had reviewed that, that would be true.  Again, it

13  is not my job.  That doesn't fall under my job.  It falls

14  under Captain O'Neil, who is an attorney, to review those

15  things.

16  Q.   Not your job?

17  A.   I am -- I have served search warrants, I have been

18  involved in search warrants, but I have never written a

19  search warrant.

20  Q.   Thank you, sir.

21              THE COURT:  Redirect.

22              MR. MONTMINY:  Very briefly, Your Honor.

23                      REDIRECT EXAMINATION

24  BY MR. MONTMINY:

25  Q.   Sergeant Miller, Mr. Yarbrough asked you a question

concerning at the time that you saw the weapons in the master

bedroom.  At that point in time he asked some questions about

why you didn't get a search warrant at that point in time.

When you initially saw -- my question to you directly is

this.  When you first saw the weapons in the master bedroom,

had you spoken to dispatch and reached out to dispatch about

the criminal history of the defendant?

A.    No.  Not yet.  That was just following that actually.

Q.    After the point?

A.    Yes, sir.

Q.    Was it -- did you call dispatch after Mrs. Bostick led

you to the basement where the safes were?

A.    Yes.

Q.    Mr. Yarbrough also asked you several questions regarding

your view pertaining to the reliability of Mrs. Bostick.  At

the time that you were meeting with Mrs. Bostick on the

evening of November 4, 2012, did you know that Mrs. Bostick

was the wife of Mr. Bostick?

A.    I did.

Q.    Did you have the conversations that you had with Mrs.

Bostick that obviously as you mentioned was it face-to-face

conversation, correct?

A.    Yes.

Q.    Did you have any reason at all, in your opinion, from

speaking with her to doubt what she was saying to you, any

1  reason at all?

2  A.   Not at that point, no.

3  Q.   Mr. Yarbrough also asked you questions about your

4  knowledge of Mr. Bostick.  You concede, you admit that you

5  knew Mr. Bostick; was it from television?

6  A.   I had seen a few commercials, but I don't even watch

7  television.  I watch about one hour a week.  So I had seen a

8  couple of commercials.  I believe from what I know he is on

9  quite a few commercials, but I don't -- I read.  I don't even

10 watch TV except for sports.

11 Q.   Can you or did you not know he could -- did you know if

12 he could sell cars at the time?

13 A.   I had no idea.  No idea.

14 Q.   Okay.  And did you know the disposition of his State

15 case?  Did you follow up on that?

16 A.   No.  And I will explain if you don't mind.

17 Q.   Sure.

18 A.   The easiest way for me to explain that is this.  I have

19 been doing this a long time, and when my time is up at night,

20 I go home to my family.  I go home.  I don't worry about

21 what's gone on at work.  I just did my job and I go home.

22 And I don't care what happens to it in court.  I don't care

23 what happens to it at all.  I just go home.  So I never

24 even -- I never had any other involvement in that case.

25 Q.   To your knowledge, the term nolle prossed, you know what

1  nolle prossed means, correct?

2  A.    What?

3  Q.    Do you know what the term *nolle pros* means?

4  A.    Nollied?

5  Q.    Yes.

6  A.    Yes.

7  Q.    Do you know what a dismissal of charges are?

8  A.    Yes.

9  Q.    At the time on November 4, 2012, you are saying that you

10  did not know what withhold adjudication was; is that what you

11  were saying?

12  A.    Not at all.  And in fact, I will elaborate on that as

13  well.  Your Honor, I teach field training officers how to

14  train officers.  I teach instructors how to instruct.  I have

15  got thousands of hours worth of training in law enforcement,

16  and I never once heard the word *adjudication withheld* in the

17  State of Tennessee.  Never.

18          MR. MONTMINY:  Your Honor, no further questions

19  for this witness.  Thank you.

20          MR. YARBROUGH:  Your Honor, if I may.

21          THE COURT:  Yes.

22                  RECROSS-EXAMINATION

23  BY MR. YARBROUGH:

24  Q.    When did you learn that adjudication withheld meant

25  there was not a conviction?

A.   When we found out that there was going to be some issue

with the hearing, and that would have been from Captain

O'Neil that it would have been most likely months after.  And

I had, again, the next involvement that I have had with this

case at all was to meet with them about this particular

hearing.  That's it.

Q.   Thank you.

THE COURT:  Anything else from this witness?

MR. MONTMINY:  No, Your Honor.

THE COURT:  Thank you, sir.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  We'll take a brief comfort break and

call the next witness.  Thank you.

(A recess was taken at 10:44 a.m.)

THE COURT:  Mr. Montminy, do you want to call any

other witnesses?

MR. MONTMINY:  Yes, Your Honor.  Thank you.  The

government would respectfully call Ms. Amber Treat to the

stand.

THE COURT:  Let's invite her in.  She is here.

AMBER TREAT

was called, and being first duly sworn, was examined and

testified as follows:

DIRECT EXAMINATION

BY MR. MONTMINY:

Q.   Good morning.  Make yourself comfortable, and please introduce yourself to Judge Campbell.

A.   Your Honor, my name is Amber Treat.  Former employee of Brentwood Police Department.

Q.   If it helps you, if you could move the microphone closer and do us a favor and try to speak up as much as you can for the court reporter.

A.   Is that better?

Q.   Yes.

THE COURT:  I can hear you fine.  Thank you.

BY MR. MONTMINY:

Q.   Ms. Treat, where are you currently employed?

A.   Work for an agency by the name of AK Investigations.

Q.   How long have you been employed there?

A.   Since December of 2015.

Q.   What is your specific duty in that job?

A.   I am a private investigator.  Specialize in criminal defense investigation.

Q.   Prior to that position, where did you work?

A.   I worked for the Brentwood Police Department.

Q.   And could you give Judge Campbell an idea as to the months and years you worked at the Brentwood Police Department.

1  A.    I worked there, hired September 27 of 2010.  And I
2  believe my final date was December 4 of 2015.
3  Q.    And during your time at the Brentwood Police Department,
4  were you in any specialized unit or position?
5  A.    Throughout the course of my career, yes.  I was a crime
6  scene tech.  I became an FTO, and I was eventually promoted
7  to sergeant.
8  Q.    It is my understanding from the time period that you
9  gave the Court when you were working at Brentwood Police
10 Department that you would have worked there back in early
11 November of 2012; is that accurate?
12 A.    That's correct, yes.
13 Q.    Were you working in that capacity on the specific late
14 afternoon, early evening of November 4, 2012?
15 A.    Yes, sir.  I was a patrol officer at that time.
16 Q.    I'd like to direct your attention specifically to a few
17 moments before 6 a.m. that evening of November 4, 2012.  Did
18 you conduct an investigation of an incident involving a
19 person who later became known to you as Jerry Christopher
20 Bostick?
21 A.    Yes, sir.
22 Q.    Do you see that person in court today?
23 A.    Yes, I do.
24 Q.    Would you kind of point to him and describe an article
25 of clothing that he is wearing.

1  A.   Yes.  He is at the table to my left.  Dark suit with a

2  yellow tie on.

3         MR. MONTMINY:  Kindly let the record reflect the

4  witness has identified the defendant.

5         THE COURT:  Granted.

6  BY MR. MONTMINY:

7  Q.   Everything you are going to mention to Judge Campbell

8  this morning all took place in the Middle District of

9  Tennessee?

10  A.   Yes, sir.

11  Q.   Describe to His Honor how your involvement in this case

12  began in the late afternoon of November 4, 2012.

13  A.   I was working on routine patrol, which basically means I

14  was in my car in a zone.  A call came over the radio for a

15  domestic disturbance.  I began in route.  I was later advised

16  that Dessie Bostick, the complainant in this case, had moved

17  locations, and I needed to met her at Brentwood High School.

18  Q.   Were you in a squad car?

19  A.   Yes.

20  Q.   Was anyone else with you?

21  A.   No.

22  Q.   What happened next?

23  A.   Next I met Mrs. Bostick at Brentwood High School.

24  Sergeant Dustin Miller was there as well.  He was the

25  supervisor on scene that evening.

```
 1            I spoke with her briefly.  She advised that she
 2   had been in a verbal altercation with her husband, the
 3   defendant, and that when she had attempted to leave, he
 4   slammed the door on her, causing an injury.  I did observe
 5   what would commonly be called a goose egg on her head.
 6   Q.   How -- can you describe that more specifically?
 7   A.   About a nickel-size bump protruding from her head from
 8   her forehead.
 9   Q.   When you were speaking with her, what, if anything, did
10   she say?  What else, if anything, did she say?
11   A.   At that time when we were still at the school, I know
12   they were discussing finances, and that's what they were
13   having an argument about.  She said she decided to leave, and
14   he told her not to leave, and that's when he slammed the
15   door.
16   Q.   How would you describe her demeanor when you were
17   speaking with her?
18   A.   She was visibly shaken.  She was upset.
19   Q.   Had you ever met her before?
20   A.   Not to my recollection, no.
21   Q.   What happened next?
22   A.   Next I was instructed to go with Mrs. Bostick and
23   Sergeant Miller and return to the house on Princeton Hills
24   Drive.
25   Q.   And then what happened?
```

1    A.    We entered the house and routine investigation asking

2    questions asking what happened that evening.  Mrs. Bostick

3    volunteered that her husband, Mr. Bostick, had weapons in the

4    home, and she directed us to the master bedroom where she

5    showed us two weapons.  One was under the mattress.  It was a

6    handgun.  And then a long gun that was behind the bed

7    somewhat tucked behind the bed.

8    Q.    Let me slow you down for a moment.

9    A.    Sure.

10   Q.    Where in the residence was the first place that you

11   spoke with Mrs. Bostick?

12   A.    It would have been in the front entryway.

13   Q.    What, if anything, did Mrs. Bostick say, if anything, in

14   that first part of the residence that you spoke to her in?

15   A.    She advised us that Chris had weapons, guns he wasn't

16   supposed to have.

17   Q.    Anything else?

18   A.    That he is a felon and that she has purchased guns for

19   him in the past because he could not legally do so.

20   Q.    Did you hear those statements from Mrs. Bostick directly

21   through Mrs. Bostick?

22   A.    Yes, sir.

23   Q.    What happened next?

24   A.    Next, she told us that there were more guns in the home.

25   There was a safe in the basement she directed us to.  It was

1    in a wine cellar.

2           And she directed us to a safe; it was tall safe

3    that could have held either handguns or long guns, and it was

4    back behind a vent basically.  Had to remove a vent to get

5    it.

6           Then she said there was also another safe in a

7    room across the way that may or may not contain guns, but she

8    did not have the combination to those weapons -- I am sorry,

9    to those safes.

10   Q.   Were the only firearms that you saw that you physically

11   saw with your own eyes, were they only in the bedroom?

12   A.   That evening, yes.

13   Q.   And, again, just so that we're clear, how many guns did

14   you see in the bedroom?

15   A.   I saw two.

16   Q.   Did she state anything else beyond what you have already

17   informed the Court as to whose guns those were?

18   A.   She confirmed that that was his side of the bed.  That

19   those guns belonged to Chris, her husband.

20   Q.   And then she took you to the basement; is that what your

21   testimony is?

22   A.   Yes.

23   Q.   What happened next?

24   A.   We go back upstairs.  I am not sure at what point, but

25   Officer Austin Kearn arrived on scene, and we continued to

conduct our investigation.  This was initially this came out
as a domestic disturbance call.  There are several things,
forms.  We ask for a statement, that sort of thing.  I am
continuing to conduct that investigation.

Q.    During this time when you were in the residence when you
initially met with her in the front of the residence, then
went to the master bedroom and then to the basement, during
that period of time was Mr. Bostick, the defendant, was he
present in the home?

A.    Not to my knowledge, no.

Q.    Did you have any knowledge as to where he may have been
at that point in time?

A.    We were given ideas of where he may have gone, but we
did not know for sure, no, sir.

Q.    When you were speaking with Mrs. Bostick back at the
Brentwood parking lot, the Brentwood High School parking lot
as well as inside the residence, from your -- in your opinion
from speaking with her, did you have any reason to doubt what
she was saying to you, in your mind?

A.    No, sir, I had no reason to doubt her words.

Q.    Is there a way you can explain that to the Court?

A.    She appeared to be very nervous.  Scared.  She was
upset.  She had a physical injury that I observed.  I had no
reason to believe that she was lying to me.

Q.    At the time that she spoke to you, was it your knowledge

1  that she was his wife?  Is that what you said?

2  A.   Yes, sir.

3  Q.   Going back to the master bedroom, you made reference to

4  the firearms.  Did you also find any ammunition in the master

5  bedroom?

6  A.   Yes, sir.

7  Q.   After you go down to the basement and observe the safes,

8  did Mrs. Bostick say anything else about what may be in the

9  contents of those safes beyond what you have already informed

10  the Court?

11  A.   Not to my recollection, no.

12  Q.   So after you go back upstairs, what happens next?

13  A.   As I said, we, Officer Kearn and I once he arrived, we

14  continued our investigation just gathering facts as to what

15  happened regarding the assault.  And Sergeant Miller, he was

16  in and out of the house taking -- he was the supervisor on

17  scene, so he was taking care of supervisory functions at that

18  time.

19  Q.   Describe to Judge Campbell the difference in the role

20  between Sergeant Miller and what your role was specifically.

21  A.   Sure.  There is a primary officer on scene.  That's who

22  the call initially goes out to.  In a domestic situation,

23  there is always going to be a backup officer.  I say always,

24  but if an officer is available, they will always send

25  multiple cars to a domestic.

1          We are responsible for first ensuring the safety
2    of the people involved, securing the scene, and then
3    investigating the incident.  So asking a lot of questions as
4    to what happened, getting names, dates, personal information.
5          And then a supervisor will typically always come
6    on scene for a domestic situation.  They are responsible
7    for -- they are essentially responsible for the scene, so
8    everything that goes on, they need to know what happens.  If
9    there are any judgment calls to make, typically that
10   supervisor will make the call.  I know that particular
11   evening, Sergeant Miller had requested to confirm if there
12   was a felony on Mr. Bostick's record.
13   Q.   Was one of your primary responsibilities generating
14   statements?
15   A.   Yes, sir.
16   Q.   How long had you been a police officer for at that point
17   in time?
18   A.    I had been a police officer for a little over two years
19   but on my own off the training program for maybe 16 months at
20   that time.
21   Q.   And did you have an idea as to how long Sergeant Miller
22   had been on the force for when you were at the Bosticks'
23   residence?
24   A.    I didn't know the exact years, but I know he had quite a
25   bit more experience than I did.  And also know he worked at

1 other agencies before.

2 Q.   Had you worked with Sergeant Miller prior?

3 A.   Yes.

4 Q.   And on those, did he also serve as supervisor?

5 A.   Yes.

6 Q.   Would it be common for you to rely on Sergeant Miller

7 with information he may provide to you during the course of

8 an investigation?

9 A.   Yes, sir.

10 Q.   You indicated that one of your roles was report writing

11 and taking statements.  Did you ask Mrs. Bostick if she would

12 be amenable to writing a written statement pertaining to the

13 firearms that were -- that you saw in the master bedroom and

14 then firearms that I believe you said she believed were

15 contained in the safes?

16 A.   Yes, I did.

17 Q.   And what, if anything, did she say in response?

18 A.   She said that would be a death sentence.

19 Q.   Did she elaborate on that at all?

20 A.   She didn't.

21 Q.   How was her demeanor when she said that it would be a

22 death sentence?

23 A.   She was excited.  Not happily excited, but nervous.

24 Q.   During the time that after you went through the home, to

25 your knowledge and recollection was Sergeant Miller on the

1  phone a lot?

2  A.   I can't say exactly when he was on the phone.  I know he

3  was in and out of the house a lot.  And I do know that

4  dispatch requested that he call them, so I do know that he

5  was on the phone.  I don't know the extent.

6  Q.   Regarding that, what did Sergeant Miller advise you

7  regarding what he learned or did not learn from dispatch that

8  evening?

9  A.   That Mr. Bostick did in fact have a felony conviction on

10 his record.

11 Q.   Did he say that to you face to face or over the phone?

12 Describe to Judge Campbell how that went about.

13 A.   We discussed it while still on scene.

14 Q.   Was there any hesitation or equivocation on his part

15 when he said that to you?

16 A.   Not to my recollection, no.

17 Q.   Was it also your understanding that Brentwood Police was

18 also seeking a search warrant in the case at that time?

19 A.   Yes, sir.

20 Q.   On that evening, had you ever written a search warrant

21 affidavit before?

22 A.   Not to my recollection, no.

23 Q.   Was there a reason -- well, let me ask you this

24 question.  On that night, had you been advised that you would

25 be the affiant to the search warrant for the safes?

```
 1  A.   Yes, sir.
 2  Q.   Was there a specific reason why you were delegated with
 3  that duty that night for the first time writing a search
 4  warrant affidavit?
 5  A.   I can't speak to why.  I was the primary officer.  I was
 6  already doing the initial report.  But I can't speak to why
 7  that decision was made.
 8  Q.   Who advised you that you would be the affiant to the
 9  search warrant?
10  A.   Sergeant Miller.
11  Q.   Were you going to be, to your knowledge, were you going
12  to be delegated with the task of writing it out from scratch?
13  Or describe to Judge Campbell the process that was explained
14  to you on the evening of November 4, 2012 for the generating
15  the search warrant affidavit.
16  A.   Patrol captain at the time, David O'Neil, I was advised
17  that I was to gather all of the pertinent information that
18  would be contained within the search warrant and get that
19  information to him, and he would be assisting me in drafting
20  the warrant.
21  Q.   And describe again your understanding what David
22  O'Neil's role was at Brentwood Police Department.
23  A.   At the time, he was the captain of patrol.  He is also
24  an attorney that handles some of our general sessions cases.
25  Q.   Have you had the occasion -- is his rank, and pardon my
```

1 ignorance with the ranking in law enforcement, but is he in a

2 more of a supervisory role as a captain than what your

3 position entailed?

4 A.   Yes, sir.  He was.  I had no supervisory

5 responsibilities at that time.  And he was two levels above

6 Sergeant Miller, so it is sergeant, lieutenant, captain at

7 that agency.

8 Q.   I see.  Had you worked with David O'Neil prior to

9 November 4, 2012 as him being your supervisory higher up on

10 the supervisory position than you were?

11 A.   Yes.  He is a member of the command staff, yes.

12 Q.   Have you had to rely on him in the past on

13 investigations?

14 A.   Yes.

15 Q.   Prior to at any point that evening, did you review a

16 draft search warrant affidavit that was generated by Captain

17 David O'Neil?

18 A.   I cannot remember if it was that night or the next

19 morning, but I did review that search warrant, yes.

20 Q.   And prior to reviewing the search warrant, did you have

21 the occasion to have any phone communication with Brentwood

22 dispatch?

23 A.   Yes, sir, I did.

24 Q.   And the purpose of you contacting Brentwood dispatch

25 would be for what reason?

1  A.   I was gathering information for Captain O'Neil
2  pertaining to the confirmation of felony convictions of Mr.
3  Bostick.
4  Q.   Did you contact Brentwood dispatch before or after
5  Sergeant Miller advised you that the defendant had a felony
6  conviction?
7  A.   That would have been after.
8  Q.   So explain to the Court if Sergeant Miller had advised
9  you that the defendant had a felony conviction, why were you
10 then following up with Brentwood dispatch regarding that
11 information?
12 A.   I just wanted to make sure that I had the information
13 correct and accurate.
14 Q.   The information that you were gathering, would it be
15 sourced just for the search warrant affidavit or for any
16 additional documents, to your knowledge?
17 A.   Can you repeat the question.
18 Q.   Let me rephrase the question.  Did any of the
19 information that you seek to get from Brentwood dispatch, was
20 any of that information going to be placed into your police
21 report that you were generating that night?
22 A.   Yes.
23 Q.   In your experience as a law enforcement officer, was it
24 unusual for you to have to reach out to Brentwood dispatch to
25 gather information?

1  A.    No, that's common practice.

2  Q.    Describe that as specifically as you can regarding

3  information that you would get from Brentwood dispatch

4  regarding criminal histories of defendants.

5  A.    In the patrol cars, we do not have access to the

6  information that they do.  They are the ones that actually

7  run those searches.  We are not even allowed to run the

8  searches.  They are certified.  So we rely heavily on their

9  information.

10 Q.    To your knowledge, is it unusual for Brentwood dispatch

11 to get information from an out-of-jurisdiction dispatch unit?

12 A.    That is not uncommon.

13 Q.    That's been done on cases that you have worked on?

14 A.    Yes, sir.

15         MR. MONTMINY:  Permission to approach the witness,

16 Your Honor.

17         THE COURT:  Yes, please.

18 BY MR. MONTMINY:

19 Q.    I am going to hand up to you what has been marked as

20 Government's Exhibit 4C.  Do you recognize that?

21 A.    Yes, I do.

22 Q.    What is it?

23 A.    This is a transcript of my call with dispatcher Michael

24 Burton.

25 Q.    Can you recall the approximate time that you think you

1    placed this call?

2    A.    I believe it was in the 9 o'clock hour.

3    Q.    Okay.  Is that a fair and accurate transcript of the

4    call that you placed with Brentwood dispatch?

5    A.    Yes.

6    Q.    Did you initial it?

7    A.    Yes, I did.

8                    MR. MONTMINY:  The government would respectfully

9    move Government's Exhibit 4C into evidence at this time.

10                   THE COURT:  Granted.

11                   MR. MONTMINY:  The whole composite.  Thank you.

12   And permission to play the call, Your Honor.

13                   THE COURT:  Go ahead.

14                   (Audio played.)

15                   MR. MONTMINY:  For the record, I am placing this

16   on pause.

17   BY MR. MONTMINY:

18   Q.    The portion of the transcript at the beginning of the

19   call, you asked dispatch, What are his felony convictions; is

20   that accurate?

21   A.    That is accurate, yes.

22   Q.    When you asked Brentwood dispatch, What are his felony

23   convictions, you asked that to dispatch after Sergeant Miller

24   advised you that the defendant was convicted of a felony; is

25   that accurate?

```
 1   A.   Yes, sir.
 2   Q.   And then a few lines down, you are saying that the
 3   transcript is accurate when -- the male dispatcher that you
 4   are speaking to is who?
 5   A.   Michael Burton.
 6   Q.   Had you worked with him in the past?
 7   A.   Yes.
 8   Q.   Had you worked with dispatcher Linda Al-Sangar in the
 9   past?
10   A.   Yes.
11   Q.   Did you hear when you were on the phone -- obviously we
12   can hear this in court, but when you were on the phone at the
13   time on November 4, 2012, with your own ears did you
14   specifically hear Brentwood dispatcher Michael Burton ask
15   Linda, Linda, do you remember what his felony convictions
16   were off the top of your head?
17   A.   Yes.
18   Q.   And do you remember hearing at the time Linda in the
19   background replying by saying, It was just the one; it was
20   carrying concealed?
21   A.   I can't say that I specifically recall her saying that.
22   Q.   Okay.  All right.  Is that accurate right now in the
23   transcripts?
24   A.   It is accurate on the transcript.
25   Q.   So you just don't remember it right now?
```

1  A.   Right now.

2           (Audio played.)

3  Q.   You asked the dispatcher or you state, There was no

4  action on that one.  I am not going to write that one down.

5           Can you explain that to Judge Campbell.

6  A.   Yes.  There was no need to write a nonfelony conviction

7  down at that time.  I was only interested in the felony

8  convictions.

9  Q.   Why?

10 A.   Because that's what we were basing the search warrant

11 on.  That was part of the probable cause for the search

12 warrant.

13          (Audio played.)

14          MR. MONTMINY:  For the record, Your Honor, we'll

15 move on to the next clip, which is a continuation of the

16 call.

17          THE COURT:  Okay.

18          (Audio played.)

19 Q.   All right.  Ms. Treat, going up maybe seven or eight or

20 nine lines up from the bottom of the transcript, you mention

21 that you are out here on report.  Just describe what that

22 means.

23 A.   That simply means that I am still on scene, but I was

24 not actively engaged with any of the participants.  I was

25 starting the report, the incident report.

1  Q.   I see.  So after the conclusion of this phone call that

2  you had with Brentwood dispatch, what conclusion did you

3  reach regarding whether the defendant had a -- was convicted

4  of a felony?

5  A.   As I understood, he was convicted of a felony and had a

6  sentence of probation.

7  Q.   Could you describe to Judge Campbell -- let me rephrase

8  the question.  Did you have probable cause to believe at the

9  conclusion of this phone call that the defendant was a

10  convicted felon?

11  A.   Yes, sir.

12  Q.   Did you have probable cause to believe that there were

13  from your observations at the house that there were firearms

14  inside of the home?

15  A.   Yes, sir.

16          MR. YARBROUGH:  If Your Honor please, I am sorry

17  to interrupt, but I think that's a matter for the Court to

18  decide.  He is asking for a legal conclusion from the

19  witness.

20          THE COURT:  She can describe what she relied on.

21          MR. MONTMINY:  Yes, Your Honor.

22  BY MR. MONTMINY:

23  Q.   Describe to the Court what you relied on to make an

24  assessment as to whether or not there may have been other

25  firearms in the home.

1    A.   Mrs. Bostick had already shown us weapons, guns that

2    were in the home and told us there were further guns in a

3    safe which she described and then subsequently showed us.

4    Q.   I believe you made reference to this prior, but just to

5    clarify, were the safes of a size that in your opinion

6    firearms could be placed inside of those safes?

7    A.   Yes, sir.

8    Q.   Similarly, could you please describe to Judge Campbell

9    all the factors that you assessed in determining whether or

10   not you had probable cause to believe that the defendant was

11   convicted felon from throughout the entire investigation up

12   to this point up to the end of this phone call.

13   A.   It began with Mrs. Bostick telling us that he was.  That

14   led us to investigate further.  Sergeant Miller handled --

15   Q.   I don't mean to interrupt, but he was what?

16   A.   A convicted felon.  Sorry.  That Mr. Bostick was a

17   convicted felon.

18   Q.   Did she specifically say the word *convicted*?

19   A.   I don't recall.  She said felon.

20   Q.   She said felon, okay.

21   A.   She said felon.

22   Q.   What else?

23   A.   The fact, that she said he could not purchase weapons

24   for himself and asked others to do so that he could not

25   legally purchase them for himself and asked others to do so.

And then the information that I obtained from Sergeant Miller
stating that he is a convicted felon, all of those things
combined led me to believe that I had enough probable cause
for the search warrant.

Q.   Describe to Judge Campbell as to in your experience as a
law enforcement officer, describe to Judge Campbell what
conclusion you reach if there is a situation where there is a
sentence that results in probation and court costs for a
felony.  What conclusion do you reach based on that
information?

A.   I would conclude that there was a conviction in that
matter.  A felony conviction in his specific, Mr. Bostick's
specific matter.

Q.   Why would that be?

A.   Because there was a sentence imposed in the disposition.

Q.   When you say the word *disposition*, does that equate with
sentence?

A.   Not necessarily.  But the final outcome of the case
would be a better way to put it.

Q.   So in this matter, dispatch advised you that Mr. Bostick
had a probationary sentence and court costs?

A.   Correct, yes.

Q.   Were you also advised that he had a felony?

A.   Yes.

Q.   So is your testimony that in your mind that information

1  led you to believe that he was a convicted felon?

2  A.   Correct, yes.

3  Q.   Now, do you concede, Ms. Treat, that dispatch did use

4  the term *adjudication withheld*?

5  A.   Yes, sir.

6  Q.   And you heard that with your own ears, correct?

7  A.   Yes, sir.

8  Q.   Had you ever heard of the term *adjudication withheld*

9  prior to the evening of November 4, 2012?

10 A.   No, sir.

11 Q.   During your time as a police officer leading up to that

12 point on November 4, 2012, had you come into contact with

13 having to run priors for suspects from the State of Florida a

14 lot, or how would you describe that?

15 A.   It is possible.  We come in contact with so many people

16 and run so many people, I couldn't differentiate which states

17 how many.  I couldn't say specifically.

18 Q.   From your recollection from speaking with Sergeant

19 Miller that night, did Sergeant Miller express anything to

20 you that led you to believe that Sergeant Miller had

21 experience with withheld adjudication?

22 A.   No, sir.

23 Q.   Have you ever had training or experience as a law

24 enforcement officer in the State of Florida?

25 A.   No.

Q.    After you concluded this call with dispatch, what did
you do next?

A.    I remained on scene for a little while.  Then I returned
to Brentwood Police Department headquarters, and I spoke with
Sergeant Miller. We discussed the case.  And then I went
home for the evening.

Q.    At some point, did you write your police report in this
case?

A.    Yes, sir.

Q.    Did you include in your police report the term
*adjudication withheld* in your police report?

A.    No, sir.

Q.    Describe to Judge Campbell why you did not.

A.    The term at that point to me had no relevance.  It was
legal language that was on the record.  But to our knowledge,
to my knowledge, what I understood from Sergeant Miller, it
had no bearing on a conviction.  It just didn't have
relevance at that point.

Q.    Based on what you have already advised the Court this
morning?

A.    Correct, yes.

Q.    Did you intentionally leave out the term *withhold
adjudication* in your police report?

A.    No.

Q.    At some point, I believe you stated a moment ago that at

1    some point you left the residence; is that accurate?

2    A.    Yes.

3    Q.    And then you went back to your police department?

4    A.    Yes.

5    Q.    What did you do there?

6    A.    I spoke with Sergeant Miller, and I know that we looked

7    through that NCIC history.  I had started my report.  I don't

8    remember if I finished it that night or the next morning.

9    Q.    Was anything that you reviewed with your own eyes on

10   that NCIC report, did that change your assessment as to

11   whether the defendant was or was not convicted of a felony

12   offense?

13   A.    No.

14   Q.    You indicated earlier that it was your understanding

15   that David O'Neil would be drafting a draft search warrant,

16   correct?

17   A.    Correct, yes.

18   Q.    And you said that you had never written one before,

19   right?

20   A.    That is correct.

21   Q.    So did you have occasion to review the draft that was

22   generated by Captain David O'Neil?

23   A.    Yes, sir.

24             MR. MONTMINY:  Permission to approach the witness,

25   Your Honor.

1          THE COURT:  Go ahead.

2    BY MR. MONTMINY:

3    Q.   I am handing you what has been premarked and shown to

4    defense as Government's Exhibit 3.  Do you recognize that?

5    A.   Yes, I do.

6    Q.   What is it?

7    A.   This is the search warrant pertaining to this case, the

8    search warrant in question.

9          MR. MONTMINY:  This is also, Your Honor, marked as

10   the attachment 3 to the government's response.  It is the

11   exact same set of documents, for the record.  And the

12   government would move these documents into evidence.

13         THE COURT:  Granted.

14   BY MR. MONTMINY:

15   Q.   Describe to Judge Campbell what, if anything, you did on

16   the following morning, November 5, 2012.

17   A.   The following morning, I came into work early around

18   8:30.  I and a detective who handles these things frequently

19   went with me to go get the search warrant signed.  I read

20   over everything.  It is as I -- it is the information that I

21   gave Captain O'Neil to plug into it.  It was accurate.

22   Q.   Did you -- I didn't mean to interrupt.

23   A.   No, no, go ahead.

24   Q.   Did you read over the search warrant and the search

25   warrant affidavit word by word, line by line?

1  A.   Yes, sir.

2  Q.   Was there anything contained in the search warrant or

3  the search warrant affidavit that you disagreed with at all?

4  A.   No, I agreed with everything.  I wouldn't allow my name

5  printed or signed on this document if I didn't agree with its

6  contents.

7  Q.   So describe what happened.  Do you drive to the

8  courthouse?  Describe what happens.

9  A.   Yes, drove to the courthouse with Detective Brady, Mike

10 Brady.  We met Judge Robbie Beal.  Had the search warrant

11 signed, and then we went back to the Brentwood Police

12 Department where we basically put an action plan together and

13 decided which officers were going to assist us in serving the

14 search warrant.

15 Q.   Was there anything else that dealt with your assessment

16 as to whether the defendant was a convicted felon in the

17 second that leading up to you handing the search warrant

18 affidavit to the state court judge that was different than

19 what you have already mentioned previously?

20 A.   No.

21 Q.   And at the time that you handed that affidavit to the

22 judge, did you believe that the defendant was a convicted

23 felon?

24 A.   Yes, sir.

25 Q.   What happened next?

1  A.   Next, I attempted to make contact with Mrs. Bostick.

2  Advised her that we would be coming to the house to serve the

3  search warrant.  She told us that Mr. Bostick was not

4  present, and she granted us access to the home.

5  Q.   What happened next?

6  A.   Officers went in.  We attempted to access the safe.  I

7  know that there was not -- we did not have the combinations

8  right away.

9  Q.   What happened next?

10  A.   One of the detectives spoke back and forth with Mr.

11  Bostick and then his attorney.  Obtained the combinations.

12  We opened the safes, and from the large safe I referred to,

13  we seized six firearms from that safe.

14  Q.   Were there any firearms recovered in the second safe?

15  A.   No.

16         MR. MONTMINY:  Can I have a brief moment, Your

17  Honor?

18         THE COURT:  Yes.

19         MR. MONTMINY:  Judge, no further questions for

20  this witness at this time.

21         THE COURT:  Okay, thank you.

22         Mr. Yarbrough.

23                    CROSS-EXAMINATION

24  BY MR. YARBROUGH:

25  Q.   Good morning, Ms. Treat.

```
 1   A.    Good morning, sir.
 2   Q.    We met three and a half years ago --
 3   A.    Approximately.
 4   Q.    -- in this case, right?  Just to summarize a couple of
 5   things that Sergeant Miller was not able to address, you did
 6   get an arrest warrant for Mr. Bostick overnight before the
 7   search warrant was executed, correct?
 8   A.    Officer Austin Kearn did, yes.
 9   Q.    On the domestic assault and on the gun charges?
10   A.    Yes.
11   Q.    And the gun charge was the State charge of felon in
12   possession of a firearm; is that correct?
13   A.    That's correct, sir.
14   Q.    So you had already acted on the in terms of an arrest,
15   charging Mr. Bostick before you knew what was in the safe?
16   A.    That's accurate.
17   Q.    Is that correct?
18   A.    Yes.
19   Q.    So and you knew -- I assume you were doing domestic
20   assault cases on a regular basis at that time in your career,
21   correct?
22   A.    I would say that's accurate.
23   Q.    And I am sure that you knew as a result of that, did you
24   not, that he would be excluded from the house until the case
25   was over unless there was some agreement; is that correct?
```

1  A.   It is fair to say that bond conditions vary in those
2  instances.
3  Q.   Once he was arrested, there would be a 12-hour hold that
4  would keep him in custody before going back to the house or
5  any other place, correct?
6  A.   That is not always the case.  That is general practice,
7  but that's not always the case.
8  Q.   But that's in the law, right?
9  A.   In my experience, that's not always been the case.
10 Q.   Okay.  And so getting this search warrant served on the
11 two safes was something that could have been done over the
12 next several days based on the nature of the charges,
13 correct?
14 A.   That is correct.
15 Q.   It would have been relatively easy, would it not, to
16 actually get the court records from the clerk in Brevard
17 County, Florida faxed to your office in Brentwood so that you
18 could actually look at the case record and see what really
19 happened in this case that results in seven or eight
20 different communications between you and the dispatcher and
21 the dispatcher and Brevard, Florida?  Sorry; that was a very
22 long question.
23         But basically you could have verified whether he
24 did or did not have a felony the next day with the Clerk's
25 Office, could you not?

1  A.   It was my understanding it had already been verified.

2  Q.   I am sorry.  I couldn't hear that.

3  A.   It was my understanding that the felony conviction had

4  already been verified.

5  Q.   Okay.  Well, let's look at that.  You heard the

6  recording a moment ago.  And we have the transcript, and if

7  you need to look at it -- do you have it there in front of

8  you?

9  A.   Yes, sir, I do.

10  Q.   When we get to the use of the word *adjudication*, the

11  first thing that Mr. Burton says is adjunction.  Do you

12  recall that being a word that he used?

13  A.   Yes, sir.

14  Q.   Do you know if that's a word or not?

15  A.   I don't know that that's a word I have ever used.

16  Q.   Well, you kind of corrected him by saying injunction

17  withheld, didn't you?

18  A.   Well, I was questioning.

19  Q.   Pardon?

20  A.   I wasn't sure exactly what he said.  I was asking him a

21  question.

22  Q.   But you had already seen adjudication withheld on other

23  reports, had you not?

24  A.   Yes, sir.

25  Q.   Pardon?

1 A.   Yes.  But I wanted to make sure I was writing it down
2 exactly as he was saying it to me.
3 Q.   And when he spells it out for you, you say adjudication?
4 A.   Correct, yes.
5 Q.   Is that right?
6 A.   Yes.
7 Q.   Sort of helping him with this word that he obviously is
8 not familiar with; is that right?
9 A.   He spelled it out, and that's the word that I came up
10 with from the spelling, yes, sir.
11 Q.   And yet I thought I heard you say a moment ago when the
12 government was asking you questions that you had never heard
13 of adjudication withheld?
14 A.   As a legal term, those words together as a legal term, I
15 have not heard those words together.
16 Q.   In 2012, did the Brentwood Police Department have access
17 to the Internet?
18 A.   Yes, sir.
19 Q.   Did you know how to use it?
20 A.   I did, sir.
21 Q.   Have you ever heard of Google?
22 A.   I have, yes.
23 Q.   Is there any reason why you couldn't have Googled
24 adjudication withheld so you would know what it meant?
25 A.   Again, I thought it had been verified already through my

1   supervisor and dispatch. I didn't think there was any reason

2   to at that point.

3   Q. Yes, ma'am. But my question is, is there any reason you

4   could not have verified for your own verification for acting

5   on this very serious matter?

6   A. There is no reason I couldn't have, no. I just didn't

7   think there was a need to.

8   Q. Did you make such attempt?

9   A. Not to my recollection.

10   Q. Did you look it up in the dictionary?

11   A. Not to my recollection.

12   Q. I assume you know what the word *withheld* means?

13   A. Yes.

14   Q. What does it mean?

15   A. To hold something back.

16   Q. And actually you ironically did that, didn't you, when

17   you wrote your report?

18         MR. MONTMINY: Objection, argumentative.

19         THE COURT: Ask a specific question.

20   BY MR. YARBROUGH:

21   Q. When you wrote your report, you withheld the information

22   you had gotten from the clerk in Florida, didn't you?

23   A. I did not withhold it intentionally as --

24   Q. Have you looked at your report in preparation for

25   today's hearing?

1  A.   Yes, sir, I have.

2  Q.   Are you aware that your report contains no reference to

3  the term *adjudication withheld*?

4  A.   Yes, sir.

5  Q.   That instead it says simply, quote, A criminal history

6  check of Mr. Bostick by Brentwood PD dispatch confirmed that

7  he has been convicted of a felony involving deadly weapons?

8  A.   Yes, sir, that's what I believed to be true.

9  Q.   That was a conclusion by you even though you have told

10 the dispatcher that you would put it in your report, didn't

11 you?

12 A.   If I may have a moment to reference the transcript.

13 Q.   Pardon?

14 A.   If I may have just a moment to reference the transcript.

15 Q.   Uh-huh.  It is my pages may not be the same as yours,

16 but it is about ten lines from the bottom.  Treat:  All

17 right, that's what I will put in my report.  Do you see that?

18 A.   I do.  I said that right after he said to me court costs

19 $200, sentence probation.  And then it says court costs $200.

20 Q.   Yes.  And so you are going to put that in your report,

21 but you didn't do that, did you?

22 A.   I put the felony conviction in my report.

23 Q.   Pardon?

24 A.   I put the felony conviction in my report.

25 Q.   I understand, but you didn't put what you told the

1 dispatcher you were going to put in your report, did you?

2 A. I told him that's what I would put in my report right

3 after he said, Court costs $200, sentence probation. And

4 then it says, Sentence court costs $200 at 8-28-89. It was

5 after he said that.

6 Q. Now, Ms. Treat, I assume that you have been to court a

7 few times and you knew that sometimes people get probation

8 without a conviction; is that right?

9 A. Not to my knowledge, no.

10 Q. Matter of fact, Mr. Bostick got that in this case,

11 didn't he? He got judicial diversion, one year probation,

12 case dismissed; right?

13 MR. MONTMINY: Objection, speculation.

14 THE COURT: You can ask her what she knows about.

15 THE WITNESS: I was not involved in the

16 disposition of the court case. I didn't have to testify, and

17 I was not involved.

18 BY MR. YARBROUGH:

19 Q. So your testimony is that you were never aware that in

20 the State of Tennessee, a person who gets judicial diversion

21 does not get a conviction and yet is on probation?

22 A. That I am aware of, yes.

23 Q. And are you also unaware of the fact that sometimes

24 people get probation and fines on misdemeanors?

25 A. Yes, sir.

1   Q.   And are you aware of the fact that sometimes actually

2   fairly frequently felony charges are reduced to misdemeanors?

3   A.   I am aware of that, yes.

4   Q.   And you never saw anything in a court record or NCIC or

5   anywhere else that said Mr. Bostick had been convicted of a

6   felony, did you?

7            MR. MONTMINY:  Objection, asked and answered.

8            THE COURT:  Overruled.

9            THE WITNESS:  Please repeat the question.

10  BY MR. YARBROUGH:

11  Q.   You never saw anything in the court record or the NCIC

12  report that said Mr. Bostick had been convicted of a felony?

13  A.   I did see that that he was a convicted felon.

14  Q.   What did you see?

15  A.   In the printed NCIC history.

16  Q.   Have you looked at the NCIC report lately?

17  A.   I have.

18            MR. YARBROUGH:  Your Honor, we would like to move

19  by agreement as Defense Exhibit 1 the NCIC report.

20            THE COURT:  Any objection?

21            MR. MONTMINY:  No, Your Honor.

22            THE COURT:  Granted.

23  BY MR. YARBROUGH:

24  Q.   Please take a look at that.  That's turned to the page

25  of the adjudication withheld, but feel free to look at all

1  the pages and familiarize yourself with it.  Do you recognize

2  that as the NCIC report on Mr. Bostick?

3  A.    Yes, sir.

4  Q.    Is that the same report that you were using in the

5  investigation of this case in November of 2012?

6  A.    It is the same report.  It looks like a little

7  different.  I remember it being thicker, a thicker packet.

8  Q.    What is the last line on each entry in an NCIC report?

9  What does it call for in the far left?

10  A.    Disposition.

11  Q.    Do you understand the word *disposition*?

12  A.    Yes, sir.

13  Q.    What does it mean?

14  A.    Essentially the result.

15  Q.    At the conclusion of the case, a person is convicted,

16  found not guilty, and sometimes nolle prossed, meaning that

17  the State chose to drop the prosecution, that type of thing,

18  dismissed.  Those are dispositions, aren't they?

19  A.    Yes, sir.

20  Q.    Do you see some of those dispositions in Mr. Bostick's

21  report?

22  A.    I do.

23  Q.    Don't you in looking at that, without belaboring the

24  point, do you see that each time there is a disposition, it

25  has the word *convicted guilty* or *dismissed nolle pros* or

1  something to that effect, correct?

2  A.   It appears so, yes.

3  Q.   Pardon?

4  A.   It appears so, yes, sir.

5  Q.   Okay.  But on the charge that you have told the Court

6  you believed was a felony conviction, what does the

7  disposition say?

8  A.   It says Other 1989-8-28.

9  Q.   I am sorry?

10 A.   It says the date, and then it says adjudication

11 withheld.

12 Q.   Adjudication withheld?

13 A.   Yes, sir.

14 Q.   And you are telling the Court that despite that plain

15 language and the absence of the word *conviction* or *guilty*,

16 you were prepared to swear to Judge Beal that he had a felony

17 conviction?

18 A.   Yes, sir.

19 Q.   Did you tell Judge Beal anything about adjudication

20 withheld?

21 A.   No, sir.

22 Q.   If you had told him that and he had asked you the

23 question what does that mean, what would you have said to

24 him?

25          MR. MONTMINY:  Objection, speculation.

1          THE COURT:  Granted.

2    BY MR. YARBROUGH:

3    Q.   Did you even know what it meant when you appeared before

4    Judge Beal?

5    A.   No.  I know that my supervisors, including the sergeant

6    with exponentially more experience than I, and my captain.

7    Q.   Did you consider telling Judge Beal what was actually in

8    the NCIC report?

9    A.   No.  As I said before, I didn't think it was relevant at

10   that point.  I believed there was a felony conviction.

11   Q.   As a matter of fact, you told him something entirely

12   different in the written affidavit, didn't you?  I believe

13   that's Government Exhibit 3.  I think it is in front of you.

14   And on the second page of the affidavit, the paragraph just

15   above Experience of Affiant, what is that last sentence, Ms.

16   Treat?

17   A.   A National Crime Information Center criminal history was

18   accessed by Brentwood Police dispatch which showed that

19   Bostick was convicted of a felony involving a deadly weapon.

20   Q.   That's not a true statement, is it?

21   A.   At the time, I thought that it was.  I believed it would

22   be true.

23   Q.   I asked you if it is a true statement.

24            MR. MONTMINY:  Objection, asked and answered.

25            MR. YARBROUGH:  No.

```
 1              THE COURT:  No.  She can answer.
 2              THE WITNESS:  It is a true statement at the time,
 3  or it is not a true statement, but I believed that it was at
 4  the time.
 5  BY MR. YARBROUGH:
 6  Q.   Now, be careful, Ms. Treat, because this says the NCIC
 7  showed that he was convicted of a felony.  Where on the NCIC
 8  report, Exhibit 1 for the defense, does it show that?
 9  A.   It says adjudication withheld.  It doesn't say that, but
10  that is why my supervisor did his due diligence to call
11  Florida and confirm that it was a felony.
12  Q.   Your supervisor told you that adjudication withheld
13  meant conviction; is that true?
14  A.   We believed it to be a felony conviction, yes.
15  Q.   Who told you that?
16  A.   Yes.
17  Q.   What that Sergeant Miller?
18  A.   Yes.  And Dispatcher Burton as well.
19  Q.   So Sergeant Miller told you that he knew what
20  adjudication withheld meant?
21  A.   That's not what I said.  I said that he told me that Mr.
22  Bostick had a felony conviction.
23  Q.   But the plain language of your affidavit, Ms. Treat,
24  says that the NCIC report showed that Mr. Bostick was
25  convicted of a felony.  That's what you told the judge, isn't
```

1  it?

2  A.   Yes.

3  Q.   And that's not only not true today; that wasn't true

4  then, was it?

5  A.   I thought it was true at the time.

6  Q.   Why would you think something is true that is completely

7  different from what was written in the report?

8  A.   I thought that the probation sentence was a conviction.

9  That's a conviction.

10  Q.   Ms. Treat, how long had you been a police officer in

11  2012?

12  A.   Two years.  A little over two years.

13  Q.   In your training, did they explain to you that people

14  who are convicted of felonies have certain disabilities?

15  A.   That was covered, yes.

16  Q.   That one of those disabilities would be that that person

17  would not be allowed to sell or be a dealer in automobiles in

18  the State of Tennessee?

19  A.   No, we didn't go into that much detail.  That isn't a

20  situation that the Brentwood Police Department would come

21  across very often, I can imagine.  I didn't in my experience

22  there.

23  Q.   You were aware that Mr. Bostick was an automobile

24  dealer, were you not?

25  A.   I knew that he was the face of the Carnival Kia.  I

1  don't know his capacity there.

2  Q.   So your testimony is that you were not aware that he

3  could not be an automobile dealer in Tennessee with a felony

4  conviction?

5  A.   That is correct.

6  Q.   Nor did you conduct any investigation into that issue?

7  A.   That is also correct.

8  Q.   And I believe you told the prosecutor a moment ago that

9  you did not intentionally leave out the words *adjudication*

10 *withheld*.  Is that your testimony?

11 A.   I didn't leave it out intentionally with an intent to

12 deceive anyone.

13 Q.   Okay.  But that's different from what you said.  You

14 agree now that you did intentionally leave it out?

15 A.   Phonetic -- yes, if you are going by the definition of

16 the word *intentionally*, then, yes, sir, I did.

17 Q.   And it just turns out, Ms. Treat, does it not, that that

18 is the crucial point in the whole case?

19 A.   It is a factor.

20         MR. MONTMINY:  Objection, calls for legal

21 conclusion.

22         MR. YARBROUGH:  Perhaps.  I withdraw it.

23         THE COURT:  Sustained.

24 BY MR. YARBROUGH:

25 Q.   You intentionally left out a piece of information that

```
1  turns out to be a very crucial thing, correct, ma'am?
2              MR. MONTMINY:  Objection.  Same objection.
3              THE COURT:  Overruled.
4  BY MR. YARBROUGH:
5  Q.   Do you understand that question?
6  A.   Repeat it one more time for me.
7  Q.   You intentionally left out something that turns out to
8  be very crucial information in the case?
9  A.   I intentionally left it out, but, again, with no intent
10 to deceive anyone.
11 Q.   Did you consult with anyone other than Sergeant Miller
12 to get the actual meaning of the words adjudication withheld?
13 A.   Not that I can recall, no.
14 Q.   Now, ma'am, just for a moment I want to go back to the
15 actual evening of these events.  The only information that
16 you had and the only information you put in the warrant for
17 the notion that there might be guns in these safes was
18 statements of Mrs. Bostick; is that true?
19 A.   That was part of it, yes.
20 Q.   Was there anything else?
21 A.   She showed us where they -- she showed me a safe.
22 Q.   Yes.  I say is there anything other than that?
23 A.   Other than also running the criminal history.
24 Q.   I am sorry?
25 A.   That and the criminal history as well.
```

1   Q.   From 20 years ago, right, '89 was 23 years?

2   A.   Approximately, yes, sir.

3   Q.   So other than that, you are saying that you had no other

4   information except what Mrs. Bostick was telling you?

5   A.   Not that I can recall right now, no.

6   Q.   Okay.  Well, there is nothing else in the warrant.  I am

7   just asking you if you told Judge Beal anything else.  It

8   probably wouldn't be considered here, but I am just giving

9   you an opportunity to say it if there is anything else.

10  A.   Not that I can recall, no, sir.

11  Q.   And as a matter of fact, you already had seen a rifle

12  that's been described as an AR-15 type rifle in the house,

13  right?

14  A.   Correct, yes.

15  Q.   And Mrs. Bostick was telling that you that belonged to

16  her husband, right?

17  A.   She said that she purchased it for him, yes.

18  Q.   And that's actually the way you got the warrant charging

19  him with felon in possession, right?  You already had that

20  information?

21  A.   Yes, sir.

22  Q.   But she was telling you that there might be guns in the

23  safe in addition to what you could see; is that right?

24  A.   Yes, sir.

25  Q.   Would it not be fair to say, Ms. Treat, that Mrs.

1 Bostick was quite upset with her husband that evening?

2 A.   She was upset, yes.

3 Q.   What information can you give this court for the idea

4 that she might be an independent or reliable source of

5 information for you to use in a search warrant?

6 A.   Well, she had already confirmed two facts.  She reported

7 an assault, and I observed physical injuries on her person.

8 And she also told us that there were weapons in the bedroom,

9 and she showed them to us.  So those are statements that she

10 told me that did turn out to be true.

11 Q.   She was telling you anything that she could think of

12 that would get her husband in more trouble, right?

13             MR. MONTMINY:  Objection, speculation.

14             THE WITNESS:  I can't --

15             THE COURT:  Sustained.

16 BY MR. YARBROUGH:

17 Q.   Did she tell you anything that was favorable to her

18 husband?

19 A.   I can't recall.

20             MR. YARBROUGH:  May I have a moment, Your Honor?

21             THE COURT:  Yes.

22             MR. YARBROUGH:  That's all.

23             THE COURT:  Mr. Montminy.

24             MR. MONTMINY:  Very briefly, Your Honor.

25

REDIRECT EXAMINATION

BY MR. MONTMINY:

Q.   All right, Ms. Treat, Mr. Yarbrough asked you some
extensive questions.  One segment of the questions dealt with
the information that you had that you placed in the search
warrant affidavit regarding the information you had that the
defendant may have had guns in the home that you had not yet
seen?

A.   Yes.

Q.   You indicated to Mr. Yarbrough that you arrived at that
assessment based on what Mrs. Bostick told you?

A.   Yes.

Q.   Is that accurate?  And Mr. Yarbrough also indicated,
questioned you about her reliability.  At the time that you
spoke with Mrs. Bostick, did you know that she was married to
the defendant?

A.   Yes, sir.

Q.   Were these statements by Mrs. Bostick given to you face
to face?

A.   Yes, they were.

Q.   Was there any indication from your interaction with Mrs.
Bostick that she was not giving you correct information?
Anything that led you to believe that?

A.   No, I believed her statements to be true.

Q.   And then you also indicated to Mr. Yarbrough that you

1    saw the firearms in the master bedroom and that you also saw

2    the safes, correct?

3    A.    Correct, yes.

4    Q.    Mr. Yarbrough also asked you about the information that

5    you had regarding your assessment, your determination that

6    you believed the defendant to be a convicted felon.  Can you

7    again describe to Judge Campbell how you made that

8    assessment, what information you had that led you to come to

9    that determination that the second you handed the affidavit

10   to the state court judge?

11   A.    I had spoken with Sergeant Miller about it.  I had

12   confirmed it via dispatch, and I had spoken with Captain

13   O'Neil, whose guidance and supervision I respected.  No

14   superiors expressed any concern.  And a seasoned detective

15   went with me to sign out the warrant, to swear out the

16   warrant.  I had no concerns.  I had no reason to believe that

17   there was anything false in the search warrant.

18   Q.    Okay.  Specifically, did you have any reason to believe

19   that what your supervisor, Sergeant Miller, advised you

20   regarding the status of the defendant as a convicted felon

21   was inaccurate?

22   A.    I had no reason to believe it was inaccurate, no.

23   Q.    Did you have any reason to believe what Mrs. Bostick

24   advised you personally that the defendant was a felon and

25   cannot lawfully purchase guns was inaccurate?

1   A.    I had no reason to believe her statement was inaccurate.

2   Q.    Did you yourself hear on dispatch the dispatchers when

3   you called Brentwood dispatch using the term *conviction* in

4   reference to the carrying concealed charge out of Florida?

5   A.    Yes, sir.

6   Q.    And did you use that term *conviction* when you initially

7   called them?

8   A.    I did, yes.

9   Q.    Mr. Yarbrough asked you questions regarding the NCIC

10   report that you say that you reviewed when you got back to

11   the police station after leaving the Bostick residence.  Do

12   you remember that line of questioning?

13   A.    I do.

14   Q.    Do you know for a fact that that is exactly the

15   duplicate copy that you reviewed that date?

16   A.    It is definitely not.  The font is different.

17   Q.    You indicated in your affidavit under the Experience of

18   Affiant that on the last paragraph of your search warrant

19   affidavit that from the NCIC database through Brentwood

20   Police dispatchers you learned information.  Can you describe

21   that to Judge Campbell.

22   A.    That just leads back to what I was saying previously

23   where I don't have access to that.  We rely on dispatch for

24   information regarding subjects that we run for several

25   reasons.

1  Q.   You did speak with Brentwood dispatch pursuant to the

2  call you listened to, correct?

3  A.   Yes, sir.

4  Q.   Did you not hear the calls between Brentwood dispatch

5  and Brevard County, Florida, correct?

6  A.   Correct.  I was conducting my investigation at the time.

7  Q.   On that NCIC report that was handed to you by Mr.

8  Yarbrough, is there reference for the carrying concealed

9  firearm case regarding the sentence that was imposed on Mr.

10 Bostick?

11 A.   Yes, there is.

12 Q.   Describe that again just so we're clear on that.

13 A.   It says probation two years.  And then it says sentence,

14 and under that it says court costs $200.

15 Q.   So just so we can picture this, you are at the Brentwood

16 Police Department physically looking at the NCIC, correct?

17 A.   Correct.

18 Q.   Do you specifically remember seeing probation and court

19 costs associated with the carrying concealed firearm charge?

20 A.   Correct, yes.

21 Q.   That occurred after you spoke with Brentwood dispatch

22 confirming what Sergeant Miller advised you; is that

23 accurate?

24 A.   That's accurate, yes.

25 Q.   Was there anything from reading that NCIC report that

1    led you to believe that there was something other than a

2    conviction, in your mind?

3    A.   No, the totality of the circumstances looking at it,

4    talking to my sergeant, talking to dispatch, I had no reason

5    to believe that it was not.

6    Q.   Based on specifically based on the sentence that was

7    imposed, can you elaborate on that if at all regarding the

8    probation, the court costs, how did you make that

9    determination?

10    A.   Can you please . . .

11    Q.   In other words, you indicated that you saw probation and

12    court costs on the NCIC report. Advise us how you made that

13    determination that in your mind it was a conviction?

14    A.   The charge was a felony. It says severity felony. And

15    there was a sentence of probation that led me to believe that

16    that probation was a sentence of a felony conviction.

17    Q.   Mr. Yarbrough also asked you questions regarding not

18    placing the term *withhold of adjudication* in your police

19    report and asked you a question about what you said to

20    dispatch you would do. Can you clarify that if you can at

21    all?

22    A.   I didn't put it in because I didn't think it had any

23    bearing on anything. I believed there was a felony

24    conviction for the charge that's listed.

25          MR. MONTMINY: Can I have a brief moment, Your

1  Honor?

2          THE COURT:  Yes.

3          MR. MONTMINY:  Your Honor, most respectfully, no

4  further questions for this witness.

5          MR. YARBROUGH:  One quick followup.

6          THE COURT:  Yes.

7                    RECROSS-EXAMINATION

8  BY MR. YARBROUGH:

9  Q.   Did you ever actually acquire the court records from

10 Brevard, Florida?

11 A.   I can't recall if they are in the case file or not.  Not

12 that night, no.

13         MR. YARBROUGH:  Your Honor, this is marked as

14 Defense Exhibit Number 2.  Again, it has been shown to the

15 government, and we have agreed that it can be introduced.

16 I'd like to show it to the witness.

17         THE COURT:  Okay, thank you.

18 BY MR. YARBROUGH:

19 Q.   That appears to be a certified document from the clerk

20 in Brevard County, Florida.  I believe you will see a stamp

21 on the final page.  Just take a look at that and see if you

22 have ever seen it before.

23 A.   I requested a number of --

24 Q.   Pardon?

25 A.   I requested and compiled a number of records for this

1  case, okay.

2  Q.   I couldn't understand that.  I am sorry.

3  A.   I said it is possible that I requested this.

4  Q.   Possible that you have seen it?

5  A.   I requested a lot of things for this case.

6  Q.   That's a certified copy of the record?

7  A.   Okay.

8  Q.   Stamped by the clerk on November 19, one week -- no, two

9  weeks after your arrest of Mr. Bostick, right?

10  A.   Yes, sir.

11  Q.   It shows on the front page adjudication withheld,

12  correct?

13  A.   Yes, sir.

14  Q.   And it has a box that could be checked for found guilty,

15  convicted or found guilty, and that box is not checked, is

16  it?

17  A.   I didn't have this at the time.  I am not sure.

18  Q.   I understand.  But just look at it and see if I am not

19  correct in my assessment of that document.

20  A.   I see up top where he entered a plea of guilty.  Where

21  are you speaking of?

22  Q.   Right below that, there are a number of boxes for the

23  court to check as to the disposition of the case.  And the

24  one for guilty is not checked, is it?

25  A.   That's correct.

Q.    But the one for adjudication withheld is checked?

A.    That's correct.

Q.    Look on the second page.  What information is given there about whether this was a conviction or not?

A.    The box that is checked reads, The Court hereby stays and withholds the imposition of sentence as to counts.  And then that's left blank.

Q.    Deferred for two years, isn't it?

A.    And places the defendant on probation for a period of two years under the supervision.  I don't see the word *deferred* anywhere.

Q.    Tell the Court, Ms. Treat, after examining that record from the Brevard County Clerk's Office if there is anything in that regard to indicate that Mr. Bostick has ever been convicted of a felony?

A.    From what I have read in this brief moment, no, I don't see that.

Q.    Finally, Ms. Treat, I am going to ask you if it isn't true that when I presented that document to the DA in Franklin in your case they dismissed voluntarily the charges against Mr. Bostick regarding firearm, true?

A.    I can't speak as to why the court dismissed that case. I was not there.  But it is my understanding that that charge was dismissed, yes.

Q.    Thank you, ma'am.

1          THE COURT:  Anything else?

2          MR. MONTMINY:  Can I have a brief moment, Your

3    Honor?

4          One brief followup, Your Honor.

5                   REDIRECT EXAMINATION

6    BY MR. MONTMINY:

7    Q.   Is it common to request those documents during the

8    course of getting a search warrant, in your experience?

9    A.   Which document are you referring to?

10   Q.   That document right there.

11   A.   This, no.

12   Q.   No further questions, Your Honor.

13          THE COURT:  Anything else for this witness?

14          MR. YARBROUGH:  No.

15          THE COURT:  You can step down.  Thank you.

16          (Witness excused.)

17          THE COURT:  Let me ask the opinion of the lawyers.

18   It seems like based on the presentation of oral evidence and

19   the cross-examination of the witnesses that the Court has

20   held a *Franks* hearing and that that issue is moot.

21          The suppression issue is supposed to be the four

22   corners of the affidavit.  And is there anything else that

23   you would want to put on in another hearing?

24          MR. YARBROUGH:  Could we have just a moment?

25          THE COURT:  Yes.

1          Mr. Montminy.

2          MR. MONTMINY:  Nothing further here.

3          MR. LITTLE:  Your Honor, rather we walk up?  But

4    we did not know the full extent of Captain O'Neil's

5    involvement.  Sounds like he drafted the words, and they were

6    reviewed and ratified.

7          THE COURT:  Can you step up to the podium.

8          MR. LITTLE:  Yes.

9          THE COURT:  It is my understanding from the papers

10   that Mr. O'Neil drafted the document, and of course it was

11   Ms. Treat who reviewed it and signed it.

12         MR. LITTLE:  Yes.  And we didn't know that, Your

13   Honor.  Weren't aware of that until Monday when they filed

14   their response.  We understand he wasn't going to be

15   available for today.  I think that I don't know that I can

16   say definitively that we don't believe we might have

17   questions for him.  I think our argument to you as to the

18   *Franks* issues will include the idea that the way that

19   Brentwood operated as a whole is reckless.  Essentially they

20   can't pass on to another officer the duty by saying here is

21   what the facts are; just swear to them.  And she just says,

22   That's what I believe because that's what somebody told me.

23   So those links in the chain are relevant to how we get from

24   what ends up in the affidavit to where the information

25   actually comes from.

```
 1            So I think we're reluctant at this point without
 2   at least looking at potentially the transcript or some
 3   assessment to sit back as to how we believe based on the case
 4   law his testimony may or may not be relevant.  So I don't
 5   know that I have that answer today.
 6            THE COURT:  Okay, thank you.  Consider it to be an
 7   open question then.
 8            MR. LITTLE:  Your Honor, we are happy to take two
 9   days to brief that to you by Tuesday or Wednesday.
10            THE COURT:  Okay.  If you want to file
11   supplemental briefs.  I don't want to hurry you.  Say a week
12   from today.
13            MR. LITTLE:  I didn't recall it is spring break
14   next week, so a week from Monday will be probably best.
15            THE COURT:  Tell me what date of the month.
16            MR. LITTLE:  That would be the 28th.
17            THE COURT:  Okay.  If the parties want to file any
18   supplemental briefs, they can do it on or before March 28th.
19            MR. LITTLE:  Thank you.
20            THE COURT:  Is there any other proof the
21   government wants to offer?
22            MR. MONTMINY:  No, Your Honor.
23            THE COURT:  Mr. Yarbrough, is there any proof you
24   want to offer?  You of course don't have to offer any.
25            MR. YARBROUGH:  Other than the brief matter that
```

1  Mr. Little addressed, no, Your Honor.

2          THE COURT:  It seems to me that we should await

3  the briefs on the 28th, and then I will make my assessment at

4  that time.  Any objection?

5          MR. LITTLE:  Not from Mr. Bostick, Your Honor.

6          MR. MONTMINY:  Nothing from the government, Your

7  Honor.

8          THE COURT:  Anything else anybody wants to say

9  about anything?

10         MR. MONTMINY:  Judge, just to clarify to make sure

11 that I understand this clearly, the defense is planning to

12 file a brief on this, and both the government and the defense

13 briefs would be due on March 28 then, Your Honor?

14         THE COURT:  If you want to file anything further,

15 it would be due the 28th.

16         MR. MONTMINY:  Yes, Your Honor.  Understood.

17         THE COURT:  Is that inconvenient?

18         MR. MONTMINY:  That would be convenient for the

19 government, Your Honor, yes.

20         THE COURT:  Simultaneous briefing.  I am not going

21 to require you to file something, but if you want to file

22 something, you may.

23         MR. MONTMINY:  Okay.

24         THE COURT:  And if after reviewing what the

25 defense files you feel the need to reply, I would give you

1  that opportunity.

2          MR. MONTMINY:  Thank you, Your Honor.

3          THE COURT:  But you would need to ask so I know.

4          MR. MONTMINY:  Yes, Your Honor.  Thank you.  I

5  just wanted to be crystal clear on this.

6          The other thing I wanted to put the Court on

7  notice, I will be out of the office the first week of April.

8  I at least as a courtesy wanted to advise you of that.  For

9  the briefs, the briefs would pertain to *Franks* as well as

10 suppression, correct?

11         THE COURT:  Well, as I understand Mr. Little, he

12 was addressing mostly the *Franks* question.  But if there is

13 something you want to further advise me of regarding the

14 suppression issues, you are welcome to do that as well.

15         MR. MONTMINY:  Yes, Your Honor.  Thank you.

16         THE COURT:  So is Mr. Little.

17         MR. MONTMINY:  Thank you very much, Your Honor.

18         THE COURT:  You are going to be out in April.  Are

19 you just putting me on notice, or are you asking for

20 something?

21         MR. MONTMINY:  You indicated that you may permit

22 the government to ask for additional time if there is -- if

23 the defense files something, for example, late on the 28th.

24 I plan to be out of the office immediately at that juncture.

25 I will contact my legal assistant and see --

```
 1              THE COURT:  There is Mr. Wehby right behind you.
 2              MR. MONTMINY:  Thank you, Your Honor.
 3              THE COURT:  He is hearing every word.  So he has
 4   ten capable fingers to type out a motion to file a reply.
 5              MR. MONTMINY:  Yes, Your Honor.  Thank you very
 6   much.
 7              THE COURT:  Is there anything else?
 8              MR. LITTLE:  Not from the defense, Your Honor.
 9              THE COURT:  Thank you.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                     REPORTER'S CERTIFICATE

2

3        I, Cathy B. Leigh, Official Court Reporter for the

4 United States District Court for the Middle District of

5 Tennessee, with offices at Nashville, do hereby certify:

6        That I reported on the Stenograph machine the

7 proceedings held in open court on March 18, 2016, in the

8 matter of UNITED STATES OF AMERICA vs. JERRY CHRISTOPHER

9 BOSTICK, Case No. 3:15-cr-182; that said proceedings in

10 connection with the hearing were reduced to typewritten form

11 by me; and that the foregoing transcript (pages 1 through

12 119) is a true and accurate record of said proceedings.

13        This the 20th day of March, 2016.

14

15                      /s/ Cathy B. Leigh
                           Cathy B. Leigh, RDR, CRR

16                           Official Court Reporter

17

18

19

20

21

22

23

24

25